# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| ELIZABETH KELLEY, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) **COMMPLAINT FOR VIOLATION OF** ) **THE FEDERAL SECURITIES LAWS** ) |
| v. | ) **DEMAND FOR JURY TRIAL** ) ) |
| CHIPOTLE MEXICAN GRILL, INC., M. STEVEN ELLS, MONTGOMERY F. MORAN and JOHN R. HARTUNG, | ) ) ) ) |
| Defendants. | ) ) |

Case No.

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

## CLASS ACTION COMPLAINT

Plaintiff Elizabeth Kelley ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Chipotle securities between February 5, 2016 and July 19, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Chipotle Mexican Grill, Inc. owns and operates quick-serve Mexican restaurants. The Company operates restaurants throughout the United States.

3.     Founded in 1993, the Company is headquartered in Denver, Colorado.  Chipotle's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "CMG."

4.     During the week of August 18, 2015, approximately 100 patrons and employees of a Chipotle restaurant in Simi Valley, California became ill.  On September 4, 2015, the Ventura County Environmental Health Division announced that the illnesses were a norovirus outbreak.  Health inspectors said that the restaurant in question contained dirty and inoperative equipment, equipment directly linked to the sewer, and other sanitary and health violations.

5.     Between August 19 and September 3, 2015, approximately 64 people fell ill after dining at Chipotle restaurants in Minnesota.  On September 17, 2015, the Minnesota Department of Health announced that the illnesses were salmonella linked to tomatoes consumed at 22 Chipotle locations.  The affected restaurants changed tomato suppliers but did not close.

6.     On or around November 1, 2015, Chipotle closed all of its restaurants in Portland, Oregon and Seattle, Washington, following reports of approximately 20 cases of E. coli by Chipotle patrons.

7.     Beginning on or around December 2, 2015, more than 140 Boston College students fell ill after dining at a Chipotle restaurant in Brighton, Massachusetts.  On December 9, 2015, health officials confirmed that the students had contracted norovirus.

8.     On January 6, 2016, pre-market, Chipotle announced that the company was served in December 2015 with a federal grand jury subpoena as part of a criminal investigation tied to the previous summer's norovirus outbreak at the Company's restaurant in Simi Valley, conducted by the U.S. Attorney's Office for the Central District of California in conjunction with the Food and Drug Administration ("FDA").

9.     The foregoing incidents exposed the fact that Chipotle's quality controls were not in compliance with applicable consumer and workplace safety regulations, and were inadequate to safeguard consumer and employee health.  Facing a sharp drop-off in sales, Chipotle responded with widely publicized measures that the Company touted as improvements to its food safety protocols.  On February 8, 2016, the Company closed all of its restaurants for several hours for an all-staff meeting regarding food safety.  In addition, Chipotle hired a new head of food safety who implemented a number of changes to policies at the Company's restaurants—for example, requiring all employees to wash their hands every half hour, mandating that two employees verified that certain ingredients had been immersed in hot water for at least five seconds to kill germs, and using Pascalization to pre-treat food ingredients.  By touting these measures, along with free food promotions and increased advertising, Chipotle aimed to restore customer confidence in the safety of its food.

10.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Chipotle's

purported improvements in its restaurants' food safety policies were inadequate; (ii) accordingly, Chipotle's quality controls were still not in compliance with applicable consumer and workplace safety regulations; (iii) in turn, Chipotle's quality controls remained inadequate to safeguard consumer and employee health; and (iv) as a result of the foregoing, Chipotle's public statements were materially false and misleading at all relevant times.

11.    On July 18, 2017, media outlets reported that Chipotle had closed a restaurant in Sterling, Virginia due to a suspected norovirus outbreak.  According to *Business Insider*, citing information from iwaspoisoned.com, a website on which consumers document suspected incidents of foodborne illness, at least 13 customers fell ill after eating at the Chipotle restaurant in question between July 14 and July 15.  The *Business Insider* article further stated that customers who fell sick after eating at the restaurant reported "vomiting violently," fevers, "violent stomach cramps," and dizziness for several days.

12.    On this news, Chipotle's share price fell $17.02, or 4.34%, to close at $374.98 on July 18, 2017.

13.    On July 20, 2017, *The Wall Street Journal* published an article entitled "Over 100 Report Being Sickened at Virginia Chipotle," disclosing that the number of reports of illness associated with the restaurant-chain continue to rise.  The article stated, in relevant part:

> Chipotle Mexican Grill Inc. reopened the location it temporarily closed this week in Sterling, Va. after learning of a small number of customers who complained of getting sick after eating there.
>
> ***But its latest food safety incident may be worse than expected, as the number of reports of illness associated with that store last week continue to rise.***
>
> Chipotle closed the Sterling location on Monday for a "thorough sanitization" after learning of anonymous complaints posted on iwaspoisoned.com, saying it suspected the culprit was norovirus, a common virus that can be spread through food that has been handled by people who are sick. The location reopened on Wednesday.

> *As of late Wednesday night, Patrick Quade, the founder of the food poisoning website, said the site had received reports of 133 people sickened at the Sterling Chipotle.*

"We know that maintaining the highest level of safety in all of our restaurants is incumbent upon us. I made a commitment on behalf of Chipotle to make our restaurants the safest place to eat, and I am confident in the programs and procedures we have implemented," Chipotle founder and Chief Executive Steve Ells said in a statement, referring to the many changes Chipotle has made to its food-safety system in the last two years.

On Tuesday, Jim Marsden, Chipotle's executive director of food safety, said: "Norovirus does not come from our food supply, and it is safe to eat at Chipotle."

Chipotle is working with the local health department, which is investigating the cause.

(Emphasis added.)

14. On that same day, *Reuters* published an article entitled "Chipotle Virginia customer tested positive for norovirus – official," reporting that a county health department official has confirmed norovirus in a customer who ate at the Virginia Chipotle Mexican Grill Inc. restaurant.

15. Later in the day, *CNBC* published an article entitled "Rodents reportedly fall from ceiling of Dallas Chipotle," reporting that rodents were spotted at a Dallas-area Chipotle on July 19, 2017. According to the article, diners captured the incident inside the restaurant on video, which shows "rodents crawling around the floor and one climbing up the wall," and with customers claiming the rodents were falling from the ceiling.

16. On these disclosures, Chipotle's share price fell $16.78, or 4.5%, to close at $356.05 on July 20, 2017.

17. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

18.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

20.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company's principal executive offices are located within this District.

21.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

22.     Plaintiff, as set forth in the attached Certification, acquired Chipotle securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

23.     Defendant Chipotle is incorporated in Delaware, and the Company's principal executive offices are located at 1401 Wynkoop Street, Suite 500, Denver, Colorado 80202. Chipotle's common stock trades on the NYSE under the ticker symbol "CMG."

24.     Defendant M. Steven Ells ("Ells") served as the Company's Co-Chief Executive Officer ("CEO") with Defendant Montgomery F. Moran ("Moran") from 2009 until December 2016, and as sole CEO since December 2016.

25.     Defendant Moran served as the Company's Co-CEO with Defendant Ells from 2009 until December 12, 2016.

26.     Defendant John R. Hartung ("Hartung") has served at all relevant times as the Company's Chief Financial Officer and Principal Accounting Officer.

27.     The Defendants referenced above in ¶¶ 24-26 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

28.     Chipotle owns and operates quick-serve Mexican restaurants. The Company operates restaurants throughout the United States.

29.     During the week of August 18, 2015, approximately 100 patrons and employees of a Chipotle restaurant in Simi Valley, California became ill.  On September 4, 2015, the Ventura County Environmental Health Division announced that the illnesses were a norovirus outbreak.  Health inspectors said that the restaurant in question contained dirty and inoperative equipment, equipment directly linked to the sewer, and other sanitary and health violations.

30.     Between August 19 and September 3, 2015, approximately 64 people fell ill after dining at Chipotle restaurants in Minnesota.  On September 17, 2015, the Minnesota Department of Health announced that the illnesses were salmonella linked to tomatoes consumed at 22 Chipotle locations.  The affected restaurants changed tomato suppliers but did not close.

31.     On or around November 1, 2015, Chipotle closed all of its restaurants in Portland, Oregon and Seattle, Washington, following reports of approximately 20 cases of E. coli by Chipotle patrons.

32.     Beginning on or around December 2, 2015, more than 140 Boston College students fell ill after dining at a Chipotle restaurant in Brighton, Massachusetts.  On December 9, 2015, health officials confirmed that the students had contracted norovirus.

33.     On January 6, 2016, pre-market, Chipotle announced that the company was served in December 2015 with a federal grand jury subpoena as part of a criminal investigation tied to the previous summer's norovirus outbreak at the Company's restaurant in Simi Valley, conducted by the U.S. Attorney's Office for the Central District of California in conjunction with the FDA.

34.     The foregoing incidents exposed the fact that Chipotle's quality controls were not in compliance with applicable consumer and workplace safety regulations, and were inadequate to safeguard consumer and employee health.  Facing a sharp drop-off in sales, Chipotle responded with widely publicized measures that the Company touted as improvements to its food safety protocols.  On February 8, 2016, the Company closed all of its restaurants for several hours for an all-staff meeting regarding food safety.  In addition, Chipotle hired a new head of food safety who implemented a number of changes to policies at the Company's restaurants—for example, requiring all employees to wash their hands every half hour, mandating that two employees verified that certain ingredients had been immersed in hot water for at least five seconds to kill germs, and using Pascalization to pre-treat food ingredients.  By touting these measures, along with free food promotions and increased advertising, Chipotle aimed to restore customer confidence in the safety of its food.

### Materially False and Misleading Statements Issued During the Class Period

35.     The Class Period begins on February 5, 2016, when Chipotle filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results

for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K"). For the quarter, Chipotle reported net income of $67.87 million, or $2.17 per diluted share, on revenue of $997.51 million, compared to net income of $121.23 million, or $3.84 per diluted share, on revenue of $1.06 billion for the same period in the prior year. For fiscal year 2015, Chipotle reported net income of $475.60 million, or $15.10 per diluted share, on revenue of $4.5 billion, compared to net income of $445.37 million, or $14.13 per diluted share, on revenue of $4.1 billion for fiscal year 2014.

36.    In the 2015 10-K, the Company stated, in relevant part:

*Quality Assurance and Food Safety.* We are committed to serving safe, high quality food to our customers. ***Quality and food safety measures are found throughout our supply chain, from the farms that supply our food all the way through to our front line.*** We have established close relationships with some of the top suppliers in the industry, and we actively maintain a limited list of approved suppliers from whom our distributors must purchase. Our quality assurance department establishes and monitors our quality and food safety programs for our supply chain. ***Our training, operations, and risk management departments develop and implement operating standards for food quality, preparation, cleanliness and safety in the restaurants.*** Our food safety programs are also designed to ensure that we comply with applicable federal, state and local food safety regulations.

*** 

Using the assistance of highly respected experts we performed a review of the ingredients we use, with a goal of designing an industry-leading food safety program. Components of the new program include DNA-based testing of many ingredients designed to ensure the quality and safety of ingredients before they are shipped to our restaurants, changes to food preparation and food handling practices, including washing and cutting some produce items (such as tomatoes and romaine lettuce) in central kitchens, blanching of some produce items (including avocados, onions, jalapenos and citrus) in our restaurants before cutting them, and new protocols for marinating meats. We are also working to enhance our internal controls surrounding food safety by utilizing the Food and Drug Administration's Hazard Analysis Critical Control Point (HACCP) management system. Additionally, we are focused on internal training programs to ensure that all employees thoroughly understand our high standards for food safety and food handling, and we offer paid sick leave to employees to reduce incentives for employees to work while sick. These and other enhancements

underscore our commitment to becoming a leader in food safety while **we
continue to serve high quality food that our customers love.**

\*\*\*

As a result of the food safety incidents associated with our restaurants during
2015, we have implemented a number of enhancements to our food safety
protocols, and intend to make additional enhancements, to ensure that our food is
as safe as it can be.  Many of our new procedures, which go beyond the industry-
standard food safety practices that we were previously following, will increase the
cost of some ingredients or the amount of labor required to prepare and serve our
food. If we aren't able to increase sales to offset the increased costs resulting
from these changes, our margins will fall well short of levels we have historically
achieved.  Even if we were to restore sales to levels we were achieving prior to
the food safety incidents, the increased costs from these changes will result in
lower margins than we were able to achieve in the past.

(Emphasis added.)

37.    The 2015 10-K contained signed certifications pursuant to the Sarbanes-Oxley

Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information

contained in the 2015 10-K was accurate and disclosed any material changes to the Company's

internal control over financial reporting.

38.    On April 27, 2016 Chipotle filed a quarterly report on Form 10-Q with the SEC,

announcing the Company's financial and operating results for the quarter ended March 31, 2016

(the "Q1 2016 10-Q").  For the quarter, Chipotle reported a net loss of $26.43 million, or $0.88

per diluted share, on revenue of $834.46 million, compared to net income of $122.64 million, or

$3.88 per diluted share, on revenue of $1.08 billion for the same period in the prior year.

39.    The Q1 2016 10-Q contained signed certifications pursuant to SOX by the

Individual Defendants, stating that the financial information contained in the Q1 2016 10-Q was

accurate and disclosed any material changes to the Company's internal control over financial

reporting.

40.     On July 22, 2016, Chipotle filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").  For the quarter, Chipotle reported net income of $25.60 million, or $0.87 per diluted share, on revenue of $998.38 million, compared to net income of $140.20 million, or $4.45 per diluted share, on revenue of $1.19 billion for the same period in the prior year.

41.     The Q2 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

42.     On October 26, 2016, Chipotle filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  For the quarter, Chipotle reported net income of $7.80 million, or $0.27 per diluted share, on revenue of $1.03 billion, compared to net income of $144.88 million, or $4.59 per diluted share, on revenue of $1.21 billion for the same period in the prior year.

43.     The Q3 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

44.     On February 7, 2017, Chipotle filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 10-K").  For the quarter, Chipotle reported net income of $15.98 million, or $0.55 per diluted share, on revenue of $1.03 billion, compared to net income of

$67.87 million, or $2.17 per diluted share, on revenue of $997.51 million for the same period in the prior year.  For fiscal year 2016, Chipotle reported net income of $22.94 million, or $0.77 per diluted share, on revenue of $3.90 billion, compared to net income of $475.60 million, or $15.10 per diluted share, on revenue of $4.5 billion for fiscal year 2015.

45.     In the 2016 10-K, the Company stated, in relevant part:

Quality and food safety measures are integrated throughout our supply chain, from the farms that supply our food all the way through to our front line and into our customers' hands. We maintain a limited list of approved suppliers, many of which are among the top suppliers in the industry. ***Our quality assurance department establishes and monitors our quality and food safety programs, and works closely with our suppliers to ensure our high standards are met throughout the supply chain.*** Our training, operations, and risk management departments develop and implement operating standards for food quality, preparation, cleanliness, employee health protocols, and safety in the restaurants. Our food safety programs are also designed to ensure that we not only continue to comply with applicable federal, state and local food safety regulations, but establish Chipotle as an industry leader in food safety.

While our food safety programs have always been carefully designed and have been in conformance with applicable industry standards, over the last year our Executive Director of Food Safety, a respected expert in the industry, has led a comprehensive assessment and enhancement of our food safety programs and practices. Components of our enhanced food safety programs include:

- supplier interventions (steps to avoid food safety risks before ingredients reach Chipotle);
- advanced technology (tools that eliminate pathogens while maintaining food quality);
- farmer support and training;
- enhanced restaurant procedures (protocols for handling ingredients and sanitizing surfaces in our restaurants);
- food safety certification;
- internal and third party restaurant inspections; and
- ingredient traceability.

*** 

As a result of the food safety incidents described elsewhere in this report, ***we have implemented a number of enhancements to our food safety protocols to ensure that our food is as safe as it can be.  Many of our enhanced procedures, which go beyond the industry-standard food safety practices that we were previously following, increase the cost of some ingredients or the amount of labor required to prepare and serve our food.***

12

(Emphasis added.)

46.     The 2016 10-K contained signed certifications pursuant to SOX by Defendants Ells and Hartung, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

47.     On April 26, 2017 Chipotle filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 10-Q").  For the quarter, Chipotle reported net income of $46.12 million, or $1.60 per diluted share, on revenue of $1.06 billion, compared to a net loss of $26.43 million, or $0.88 per diluted share, on revenue of $834.46 million for the same period in the prior year.

48.     The Q1 2017 10-Q contained signed certifications pursuant to SOX by Defendants Ells and Hartung, stating that the financial information contained in the Q1 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49.     The statements referenced in ¶¶ 35-48 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Chipotle's purported improvements in its restaurants' food safety policies were inadequate; (ii) accordingly, Chipotle's quality controls were still not in compliance with applicable consumer and workplace safety regulations; (iii) in turn, Chipotle's quality controls remained inadequate to safeguard consumer and employee health; and (iv) as a result of the foregoing, Chipotle's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

50.    On July 18, 2017, media outlets reported that Chipotle had closed a restaurant in Sterling, Virginia due to a suspected norovirus outbreak.  According to *Business Insider*, citing information from iwaspoisoned.com, a website on which consumers document suspected incidents of foodborne illness, at least 13 customers fell ill after eating at the Chipotle restaurant in question between July 14 and July 15.  The *Business Insider* article further stated that customers who fell sick after eating at the restaurant reported "vomiting violently," fevers, "violent stomach cramps," and dizziness for several days.

51.    On this news, Chipotle's share price fell $17.02, or 4.34%, to close at $374.98 on July 18, 2017.

52.    On July 20, 2017, *The Wall Street Journal* published an article entitled "Over 100 Report Being Sickened at Virginia Chipotle," disclosing that the number of reports of illness associated with the restaurant-chain continue to rise.  The article stated, in relevant part:

> Chipotle Mexican Grill Inc.  reopened the location it temporarily closed this week in Sterling, Va. after learning of a small number of customers who complained of getting sick after eating there.
>
> **But its latest food safety incident may be worse than expected, as the number of reports of illness associated with that store last week continue to rise.**
>
> Chipotle closed the Sterling location on Monday for a "thorough sanitization" after learning of anonymous complaints posted on iwaspoisoned.com, saying it suspected the culprit was norovirus, a common virus that can be spread through food that has been handled by people who are sick. The location reopened on Wednesday.
>
> **As of late Wednesday night, Patrick Quade, the founder of the food poisoning website, said the site had received reports of 133 people sickened at the Sterling Chipotle.**
>
> "We know that maintaining the highest level of safety in all of our restaurants is incumbent upon us. I made a commitment on behalf of Chipotle to make our restaurants the safest place to eat, and I am confident in the programs and procedures we have implemented," Chipotle founder and Chief Executive Steve

14

Ells said in a statement, referring to the many changes Chipotle has made to its food-safety system in the last two years.

On Tuesday, Jim Marsden, Chipotle's executive director of food safety, said: "Norovirus does not come from our food supply, and it is safe to eat at Chipotle."

Chipotle is working with the local health department, which is investigating the cause.

(Emphasis added.)

53.     On that same day, *Reuters* published an article entitled "Chipotle Virginia customer tested positive for norovirus – official," reporting that a county health department official has confirmed norovirus in a customer who ate at the Virginia Chipotle Mexican Grill Inc. restaurant.

54.     Later in the day, *CNBC* published an article entitled "Rodents reportedly fall from ceiling of Dallas Chipotle," reporting that rodents were spotted at a Dallas-area Chipotle on July 19, 2017.  According to the article, diners captured the incident inside the restaurant on video, which shows "rodents crawling around the floor and one climbing up the wall," and with customers claiming the rodents were falling from the ceiling.

55.     On these disclosures, Chipotle's share price fell $16.78, or 4.5%, to close at $356.05 on July 20, 2017.

56.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Chipotle securities during the Class Period (the "Class"); and were damaged

upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Chipotle securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Chipotle or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

59.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

60.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Chipotle;

- whether the Individual Defendants caused Chipotle to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Chipotle securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

63.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Chipotle securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Chipotle securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

64.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

65.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

66.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

68.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to

defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Chipotle securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Chipotle securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

69.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Chipotle securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Chipotle's internal quality controls, finances, and business prospects.

70.     By virtue of their positions at Chipotle, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant

knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

71.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Chipotle securities from their personal portfolios.

72.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Chipotle, the Individual Defendants had knowledge of the details of Chipotle's internal affairs.

73.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Chipotle.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Chipotle's quality controls, businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Chipotle securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Chipotle's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Chipotle securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

74.     During the Class Period, Chipotle securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Chipotle securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Chipotle securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of Chipotle securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

75.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the
Exchange Act Against The Individual Defendants)**

77.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78.     During the Class Period, the Individual Defendants participated in the operation and management of Chipotle, and conducted and participated, directly and indirectly, in the conduct of Chipotle's business affairs.  Because of their senior positions, they knew the adverse non-public information about Chipotle's misstatement of income and expenses and false financial statements.

79.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Chipotle's financial condition and results of operations, and to correct promptly any public statements issued by Chipotle which had become materially false or misleading.

80.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Chipotle disseminated in the marketplace during the Class Period concerning Chipotle's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Chipotle to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Chipotle within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Chipotle securities.

81.     Each of the Individual Defendants, therefore, acted as a controlling person of Chipotle.  By reason of their senior management positions and/or being directors of Chipotle, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Chipotle to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Chipotle and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

82.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Chipotle.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  July 20, 2017

Respectfully submitted,

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*