**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| ROBERT NARDY, JR., and ELIZABETH KELLEY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CHIPOTLE MEXICAN GRILL, INC., M. STEVEN ELLS, MONTGOMERY F. MORAN, JOHN R. HARTUNG, TIMOTHY SPONG, MARK CRUMPACKER, and JOHN S. CHARLESWORTH,<br><br>Defendants. | **Case No. 1:17-cv-01760-WYD-STV**<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

NATURE OF THE ACTION .......... 2

JURISDICTION AND VENUE .......... 6

PARTIES .......... 6

CONFIDENTIAL WITNESSES .......... 10

SUBSTANTIVE ALLEGATIONS .......... 12

Background .......... 12

Defendants Knew That The Implementation Of New Food Safety Protocols And The Disclosure Of Foodborne Illness Outbreaks Were of Extreme Importance To Investors .......... 14

Chipotle Failed To Provide The Staff, Training and Resources Necessary To Implement Its Food Safety Protocols .......... 17

*Chipotle's Practice Of Severely Understaffing Restaurants Prevented Compliance with Food Safety Practices* .......... 19

*Chipotle Refused To Provide Additional Labor Hours To Train Employees On Food Safety Procedures* .......... 23

*Chipotle Employees Would Regularly Fraudulently "Pencil Whip" Temperatures* .......... 27

*Chipotle's Food Safety Audits Revealed That The New Food Safety Protocols Were Not Being Implemented* .......... 29

Chipotle's Failure to Implement The Food Safety Protocols Resulted In Many Foodborne Illness Complaints and Outbreaks .......... 32

*Maryland Outbreak* .......... 33

*Michigan Outbreak* .......... 33

*Minnesota Outbreak 1* .......... 34

*Florida Outbreak* .......... 35

*Minnesota Outbreak 2* .......... 36

Chipotle Corporate Was Aware of The Understaffing and Food Safety Problems ........ 37

*Defendants Were Aware Of The Chronic Understaffing Of Restaurants* ........ 38

*Defendants Were Aware Of The Widespread Failure To Implement Food Safety Procedures and The Resulting Foodborne Illness Outbreaks* ....... 41

*All Health Department Inspections, Investigations and Customer Complaints Were Reviewed By Spong in Chipotle's Corporate SSR Department* ........ 43

Materially False and Misleading Statements Issued During the Class Period........ 44

The Truth Begins To Emerge ........ 53

Omissions Based On Violations Of Items 303 and 503 ........ 56

Item 303 ........ 57

Item 503 ........ 59

PLAINTIFF'S CLASS ACTION ALLEGATIONS........ 60

COUNT I ........ 62

COUNT II ........ 66

PRAYER FOR RELIEF ........ 67

DEMAND FOR TRIAL BY JURY ........ 68

Lead Plaintiff Robert Nardy, Jr. and Elizabeth Kelley ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things.

- A review of thousands of pages of documents and communications produced to counsel for Plaintiffs by various federal, state and local health departments in response to Freedom of Information Act ("FOIA") requests or the state or local equivalents thereof.[1]
- A review of regulatory filings and reports by the Company;
- A review of security analysts' reports and advisories about the Company;
- A review of press releases, conference call transcripts, and other public statements issued by the Company;
- A review of news and media reports about the Company
- A review of deposition transcripts and declarations arising from lawsuits against Chipotle in various federal courts before the Class Period;
- Interviews with former Chipotle employees that worked for the Company during the Class Period; and

[1] Counsel for Plaintiffs have numerous additional outstanding FOIA requests pending before various federal, state and local health agencies, and anticipate additional productions from certain entities that have already made productions. In the event that these outstanding requests result in information that supports Plaintiffs' allegations or broadens the scope of the Amended Complaint, Plaintiffs respectfully request permission to amend this Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a) within a reasonable period of time after such disclosure to include any such relevant information.

- Information readily obtainable on the Internet.

Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Chipotle securities between February 5, 2016 and October 24, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Chipotle Mexican Grill, Inc. owns and operates quick-serve Mexican restaurants throughout the United States.

3. Between August 2015 and January 2016, Chipotle's sales and stock price plummeted as a result of several foodborne illness outbreaks across the country being linked to the Company's restaurants and poor food safety practices. For example, during the week of August 18, 2015, approximately 100 patrons and employees of a Chipotle restaurant in Simi Valley, California became ill with norovirus caused by poor food safety practices by Chipotle employees. Between August 19 and September 3, 2015, approximately 64 people fell ill with salmonella after dining at Chipotle restaurants in Minnesota. On or around November 1, 2015, Chipotle closed all of its restaurants in Portland, Oregon and Seattle, Washington, following reports of approximately 20 cases of E. coli by Chipotle patrons. On or around December 2,

2015, more than 140 Boston College students fell ill with norovirus after dining at a Chipotle restaurant in Brighton, Massachusetts.

4. On January 6, 2016, Chipotle announced that the Company was served in December 2015 with a federal grand jury subpoena as part of a criminal investigation tied to the previous summer's norovirus outbreak at the Company's restaurant in Simi Valley, conducted by the U.S. Attorney's Office for the Central District of California in conjunction with the Food and Drug Administration ("FDA").

5. The foregoing incidents exposed the fact that Chipotle's quality controls were not in compliance with applicable consumer and workplace safety regulations, and were inadequate to safeguard consumer and employee health. Facing a sharp drop-off in sales, Chipotle responded with widely publicized measures that the Company touted as improvements to its food safety protocols within its restaurants. Chipotle hired a new head of food safety and claimed that it had successfully implemented a number of changes to food safety practices at the Company's restaurants. By touting the implementation of these measures Chipotle aimed to restore customer confidence in the safety of its food.

6. However, as confirmed by many confidential witnesses, Chipotle failed to disclose that it never effectively implemented the food safety practices in its restaurants because it refused to provide its restaurants with the staff, training or resources to effectively execute the new food safety protocols. Rather, as a result of the drastic decline in sales and stock price, Chipotle sought to reduce costs by severely understaffing its restaurants and eliminating additional labor hours necessary to adequately train employees on the new food safety protocols. The chronic understaffing, which was tracked and discussed by upper management, prevented

employees from learning and implementing proper food safety practices. Defendants never disclosed this to investors.

7. Chipotle also failed to disclose that its weekly and quarterly food safety audits that evaluated each restaurants implementation of the food safety practices, and which were reviewed by upper management, revealed that the food safety procedures were not being followed. Indeed, as high as 70% of Chipotle's restaurants in a geographical region were outright failing the food safety audits.

8. As a result, Chipotle's restaurants were at a heightened risk of causing foodborne illness, not at a reduced risk as Defendants claimed.

9. Defendants also failed to disclose that during 2016 and 2017 Chipotle restaurants were the cause of five norovirus and salmonella outbreaks in Minnesota, Maryland, Michigan, and Florida affecting numerous patrons and employees, which were caused by sick Chipotle employees failing to follow proper food safety practices such as washing their hands when preparing and serving food.

10. The truth concerning Chipotle's food safety practices began to be revealed on July 18, 2017, when media outlets reported that Chipotle had closed a restaurant in Sterling, Virginia due to a suspected norovirus outbreak. According to *Business Insider*, citing information from iwaspoisoned.com, a website on which consumers document suspected incidents of foodborne illness, at least 13 customers fell ill after eating at the Chipotle restaurant in question between July 14 and July 15. The *Business Insider* article further stated that customers who fell sick after eating at the restaurant reported "vomiting violently," fevers, "violent stomach cramps," and dizziness for several days.

11. On this news, Chipotle's share price fell $17.02, or 4.34%, to close at $374.98 on July 18, 2017.

12. On July 20, 2017, *The Wall Street Journal* published an article entitled "Over 100 Report Being Sickened at Virginia Chipotle," disclosing that the number of reports of illness associated with the restaurant-chain continued to rise:

> As of late Wednesday night, Patrick Quade, the founder of the food poisoning website, said the site had received reports of 133 people sickened at the Sterling Chipotle.

13. On that same day, *Reuters* published an article entitled "Chipotle Virginia customer tested positive for norovirus – official," reporting that a county health department official has confirmed norovirus in a customer who ate at the Virginia Chipotle restaurant.

14. Later in the day, *CNBC* published an article entitled "Rodents reportedly fall from ceiling of Dallas Chipotle," reporting that rodents were spotted at a Dallas-area Chipotle on July 19, 2017. According to the article, diners captured the incident inside the restaurant on video, which shows "rodents crawling around the floor and one climbing up the wall," and with customers claiming the rodents were falling from the ceiling.

15. On these disclosures, Chipotle's share price fell $16.78, or 4.5%, to close at $356.05 on July 20, 2017.

16. The foregoing misconduct contravened the federal securities laws. In particular, during the Class Period, Defendants false represented that Chipotle was in compliance with food safety regulations, that the Company had effectively implemented and trained its employees on food safety practices, that it had reduced the risk of foodborne illness at Chipotle, and failed to disclose that: (i) Chipotle's purported improvements in its restaurants' food safety policies were inadequate because it failed to properly staff its restaurants or train its employees; (ii) accordingly, Chipotle's quality controls were still not in compliance with applicable consumer

and workplace safety regulations; (iii) in turn, Chipotle's quality controls remained inadequate to safeguard consumer and employee health; (iv) Chipotle's inadequate food safety practices had caused five foodborne illness outbreaks in Minnesota, Maryland, Michigan and Florida, and (v) as a result of the foregoing, Chipotle's public statements were materially false and misleading at all relevant times.

## JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

19. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company's principal executive offices are located within this District.

20. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

21. Plaintiffs, as set forth in the previously filed certifications (ECF Nos. 1-1, 13-2), acquired Chipotle securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

22. Defendant Chipotle is incorporated in Delaware, and the Company's principal executive offices are located at 1401 Wynkoop Street, Suite 500, Denver, Colorado 80202.

Chipotle is a publicly traded fast-food restaurant chain. As of December 31, 2015, the Company operated more than 1,900 Chipotle restaurants in the United States. Chipotle's common stock trades on the NYSE under the ticker symbol "CMG."

23. Defendant M. Steven Ells ("Ells") founded Chipotle in 1993 and served as the Company's Co-Chief Executive Officer ("CEO") with Defendant Montgomery F. Moran ("Moran") from 2009 until December 2016, and as sole CEO from December 2016 until November 2017. Ells served as Chairman of Chipotle's board of directors (the "Board") at all times during the Class Period.

24. Defendant Montgomery F. Moran ("Moran") served as the Company's Co-CEO with Defendant Ells from 2009 until December 12, 2016. On December 12, 2016, in light of the significant fallout from the food-borne illness outbreaks, defendant Moran resigned as co-CEO and as a director at the Board's request. Before becoming employed by Chipotle, defendant Moran, who is an attorney, served as CEO of the Denver law firm Messner & Reeves, LLC ("Messner & Reeves"), where he was employed since 1996, and where he simultaneously served as outside general counsel to Chipotle beginning in 1998. According to the Schedule 14A filed by Chipotle on March 24, 2016 in connection with the Company's annual shareholder meeting for 2016 (the "3/24/16 Schedule 14A"), defendant Moran's background as the Company's former outside general counsel "has given him an in-depth knowledge and understanding of every aspect of [Chipotle's] business" and "he has an outstanding skill set in such areas as risk management and crisis handling, and also is thoroughly familiar with management personnel throughout [Chipotle's] organization."

25. Defendant John R. Hartung ("Hartung") has served at all relevant times as the Company's Chief Financial Officer and Principal Accounting Officer. According to the 3/24/16

Schedule 14A, in addition to "having responsibility for all of [Chipotle's] financial and reporting functions," defendant Hartung "also oversees IT; safety, security and risk [*i.e.*, SSR]; and compensation and benefits." Hartung reported directly to Moran.

26. Defendant Timothy Spong ("Spong") has served at all relevant times as the Company's Executive Director of Supply Chain and SSR, a role he has held since February 2013. Immediately before this, Song served as Chipotle's Director of SSR. Spong reported directly to Hartung. Because of Song's position as the head of SSR and because he received all information, reports, and audits concerning Chipotle's food safety protocols and compliance, he was able to and did, directly or indirectly, control the content of the statements of Chipotle concerning food safety issues and he was consulted as to and participated in the drafting of those statements.

27. Mark Crumpacker ("Crumpacker") has served as the Company's Chief Marketing & Strategy Officer since 2017. In his role, Mark oversees the Company's marketing functions including advertising, digital and social marketing, events, and research. In his strategy role, he oversees long-term corporate planning and the company's innovation team which is focused on the evolution of the customer experience. Crumpacker was appointed the Company's Chief Marketing Officer in January of 2009. In 2013, Mark was named Chipotle's Chief Development Officer where he oversaw the company's real estate, design, construction, and facilities functions worldwide.

28. John S. Charlesworth ("Charlesworth") served on Chipotle's Board of Directors from 1999 to 2017 and was a member of the Audit Committee during the Class Period. Prior to joining Chipotle's Board of Directors, Charlesworth worked for McDonald's for 26 years, most recently as President of the Midwest Division of McDonald's USA from July 1997 to December

2000. As stated in Chipotle's SEC filings, Charlesworth's experience with McDonald's included responsibility for managing a large and diverse employee workforce similar in many ways to Chipotle's, and also gave him a detailed knowledge of restaurant operations and food safety, site selection and related matters. In the wake of the 2015 foodborne illness outbreaks, the Audit Committee and management agreed on additional procedures to enhance the committee's oversight over food safety risks. This enhanced oversight involved increased reporting to the Audit Committee regarding food safety-related matters, as well as participation by one or more members of the Board in certain food safety audits, trainings, and other activities. Specifically, the Board designated Charlesworth as the principal liaison to the Audit Committee in connection with its enhanced food safety oversight role.

29. The Defendants referenced above in ¶¶ 23-28 are sometimes referred to herein as the "Individual Defendants."

30. As directors, officers and executives of Chipotle, the Individual Defendants are candidates for imputing corporate scienter to Chipotle.

31. Roslyn Stone ("Stone"), COO of Corporate Wellness, Inc. ("Corporate Wellness"), a consultant retained by Chipotle prior to the Class Period, was intimately involved in Chipotle's response to the Class Period foodborne illness outbreaks. Stone worked closely with Chipotle's SSR Department during the Class Period and handled any issues raised by health departments, along with Megan Johnson and Amanda Spilos (who reported to Spong) of the SSR Department. Upon information and belief, Corporate Wellness provides companies with workplace and employee health testing and protocols, among other health services. According to documents provided pursuant to FOIA requests and state and local equivalents, Stone and Spong of SSR Department were the points of contact for Chipotle in the foodborne illness outbreaks

that occurred in 2015. For example, Stone and Sponge were apprised no later than May 13, 2015 of an outbreak of Salmonella linked to eight Chipotle customers in New York, Wisconsin, Ohio, Texas and Massachusetts. Stone and Spong were communicating with the Minnesota Department of Health no later than September 9, 2015 concerning a Salmonella outbreak in Minnesota and Wisconsin involving 27 Chipotle locations. Stone was communicating with the CDC concerning an E. coli STEC 026 outbreak that was traced to Chipotle customers from Kansas, North Dakota and Oklahoma no later than December 21, 2015. Stone was communicating with the CDC concerning the December 7, 2015 norovirus outbreak in Brighton, Massachusetts no later than December 8, 2015.

32. As an agent of the Company, Stone is also a candidate for imputing corporate scienter to Chipotle.

## CONFIDENTIAL WITNESSES

33. Confidential Witness #1 ("CW1") worked as a "Kitchen Manager" at a Chipotle restaurant located in Columbus, Ohio. CW1 worked for Chipotle from June 2016 through July 2017.

34. Confidential Witness #2 ("CW2") was an Area Manager in North Carolina area for Chipotle from April 2014 to August 2016. CW2 oversaw about 9 to 11 restaurants, and reported indirectly to Gretchen Selfridge, Restaurant Support Officer. Selfridge reported to the Co-CEOs.

35. Confidential Witness #3 ("CW3") worked as a "Crew Member" at a Chipotle restaurant in Boston, Massachusetts beginning in early 2015 until late 2016. CW2 handled the cash register, maintained the inventory, trained new crew members, prepared and cooked food,

cleaned the restaurant from open to close, handled customer complaints and questions, handled catering and take-out orders, and interviewed applicants.

36. Confidential Witness #4 ("CW4") began working as an Area Manager (also referred to as a Field Leader) for Chipotle in August 2013, supervising up to twelve locations in Alabama and the Florida panhandle through August 2017. CW4 oversaw the hiring and training of 300-plus employees. CW4 reported directly to Gretchen Selfridge, Co-COO who runs roughly 850 of Chipotle's restaurants in the U.S. South and Southwest. Selfridge reported to co-CEOs Ells and Moran.

37. Confidential Witness #5 ("CW5") was an Area Manager for Chipotle from April 2015 to July 2017. CW5 reported to a Team Director, who in turn reported to Executive Team Director Tonya Poirier. Poirier reported to Mike Duffy and Duffy reported to Ells.

38. Confidential Witness #6 ("CW6") was a General Manager at a Chipotle restaurant in Illinois from January 2016 to June 2017. Prior to that time, CW6 was an associate manager at a different Chipotle restaurant in Illinois, from August 2015 to January 2016. As a General Manager, CW6 reported to Drexel Jones, Area Manager. Jones reported to Mike Kennelly, Team Director.

39. Confidential Witness #7 ("CW7") worked as an Area Manager at Chipotle from November 2015 to January 2017, overseeing six restaurants in the Philadelphia region.

40. Confidential Witness #8 ("CW8") was a Team Director at Chipotle from 2014 or 2015 to March 2017, overseeing 10 to 11 Area Managers who managed 61 restaurants in Pennsylvania and New Jersey. CW8 previously held other positions at Chipotle since 2007, including General Manager of restaurants and Restaurateur. As a Team Director, CW8 reported to Andrew Kellogg, Executive Team Director. Kellogg initially reported to Mike Duffy,

Restaurant Support Officer. Later, Kellogg began to report to Pedro Huichapa, who was hired for a new position as Regional Executive Director. CW8 said he eventually resigned from Chipotle because he did not feel supported by his boss to help with the problems he was facing in some of his restaurants, particularly understaffed restaurants.

41. Confidential Witness #9 ("CW9") was an Area Manager at Chipotle from February 2015 until March 2017. CW9 oversaw a total of ten restaurants in Illinois, Iowa and Minnesota areas.

## SUBSTANTIVE ALLEGATIONS

### Background

42. Between August 2015 and January 2016, Chipotle's sales and stock price plummeted as a result of several foodborne illness outbreaks across the country were linked to the Company's restaurants and poor food safety practices.

43. For example, during the week of August 18, 2015, approximately 100 patrons and employees of a Chipotle restaurant in Simi Valley, California became ill. On September 4, 2015, the Ventura County Environmental Health Division announced that the illnesses were a norovirus[2] outbreak. Health inspectors said that the restaurant in question contained dirty and inoperative equipment, equipment directly linked to the sewer, and other sanitary and health violations.

[2] Sick food workers at fast food restaurants are highly likely to be conduits for spreading, among other food-borne illnesses, Norovirus. Norovirus, also known as the "Norwalk virus," is a member of the virus family Caliciviridae, which consists of several distinct groups of viruses. Humans are the only host of Norovirus, which has several mechanisms that allow it to spread quickly and easily. Norovirus infects humans through person-to-person transmission or through contamination of food or water. In addition, Norovirus is able to survive a wide range of temperatures and has evolved to avoid the immune system, which results in outbreaks. Norovirus illness usually develops within one or two days after ingestion.

44. Between August 19 and September 3, 2015, approximately 64 people fell ill after dining at Chipotle restaurants in Minnesota. On September 17, 2015, the Minnesota Department of Health announced that the illnesses were Salmonella[3] linked to tomatoes consumed at 22 Chipotle locations.

45. On or around November 1, 2015, Chipotle closed all of its restaurants in Portland, Oregon and Seattle, Washington, following reports of approximately 20 cases of E. coli[4] by Chipotle patrons.

46. Beginning on or around December 2, 2015, more than 140 Boston College students fell ill after dining at a Chipotle restaurant in Brighton, Massachusetts. On December 9, 2015, health officials confirmed that the students had contracted norovirus.

---

[3] The term Salmonella refers to a group or family of bacteria that variously cause illness in humans. Salmonella is an enteric bacterium, which means that it lives in the intestinal tracts of humans and other animals. Salmonella bacteria are usually transmitted to humans by eating foods contaminated with foods that have been handled by infected food service workers who have practiced poor personal hygiene. Contaminated foods usually look and smell normal and are often of animal origin, such as beef, poultry, milk, or eggs, but all foods, including vegetables, may become contaminated. Many raw foods of animal origin are frequently contaminated, but thorough cooking kills Salmonella. Salmonella is spread to humans when they consume foods contaminated with small amounts of Salmonella. According to the CDC, contamination usually happens in one of five ways. First, raw meat, poultry, dairy or eggs pose a risk of Salmonella infection by virtue of not being cooked. Second, when preparing raw meat or poultry, food workers can transfer Salmonella onto their hands and then to other foods if they do not wash their hands between food preparation steps. Third, drippings from raw meat or poultry can contaminate surfaces and other foods in the food preparation area of a restaurant's kitchen that then come into contact with other foods that pick up the disease. Fourth, when raw meat or poultry are prepared with a cutting board and knife without being washed thoroughly between uses, and then used on other items such as produce, they can contaminate other foods. Fifth, food handlers who do not wash their hands with soap after using the bathroom can also contaminate food with Salmonella. Both Salmonella and E. coli are spread in a similar, nearly identical fashion.

[4] E. coli is a cause of illness, typically contracted through consumption of contaminated and raw food or water, and is highly virulent. The incubation period for the disease (the period from ingestion of the bacteria to the start of symptoms) is typically five to ten days, although shorter and longer periods are not unusual. E. coli is spread to humans when they consume foods contaminated with small amounts of E. coli. According to the CDC, contamination usually happens in one of the same five ways as Salmonella.

47. On January 6, 2016, Chipotle announced that the Company was served in December 2015 with a federal grand jury subpoena as part of a criminal investigation tied to the previous summer's norovirus outbreak at the Company's restaurant in Simi Valley, conducted by the U.S. Attorney's Office for the Central District of California in conjunction with the FDA.

48. The foregoing incidents exposed the fact that Chipotle's quality controls within its restaurants were not in compliance with applicable consumer and workplace safety regulations, and were inadequate to safeguard consumer and employee health.

**Defendants Knew That The Implementation Of New Food Safety Protocols And The Disclosure Of Foodborne Illness Outbreaks Were of Extreme Importance To Investors**

49. As a result of the revelations concerning Chipotle's inadequate food safety practices and the resulting foodborne illness outbreaks, the Company's sales and stock price plummeted. Chipotle stock declined from $754.03 on August 17, 2015 to $426.67 on January 7, 2016. The Company's net income for Q4 2015 was $67.87 million, a massive decline from its $121.23 million net income in Q4 2014.

50. Defendants recognized that food safety practices and the prevention of foodborne illness outbreaks were of the utmost importance to investors as the Company's sales and profitability continued to suffer throughout 2016 and 2017 as a result of the 2015 outbreaks. In its 2015 10-K, Chipotle recognized "we will need to re-establish customer trust in light of the food safety incidents that negatively impacted us beginning in the fourth quarter of 2015, and doing so in the competitive environment in which we operate will be one of our key challenges in 2016 and beyond. … Because of customer perceptions about our restaurants and brand in the wake of the food safety incidents described above, any future occurrence of food-borne illness

associated with our restaurants would likely have an even more significant negative impact on our sales and our ability to regain customers."

51. Similarly, in its 2016 10-K, the Company stated:

- "Our business was severely impacted beginning in the fourth quarter of 2015 by food safety incidents that were associated with a number of our restaurants. … In the wake of these incidents, strengthening trust among our customers and in our brand has become essential to restoring our business results and achieving our mission. This begins with our commitment to serving safe, high quality food."
- "We depend significantly on customers' perception of and connection to our brand. … The negative impact of adverse publicity relating to one or more restaurants or any of the foregoing topics may extend far beyond the restaurant(s) involved and affect many more, or even all, of our restaurants. … The adverse impact of publicity on customers' perception of us could have a further negative impact on our sales."
- "Our ability to increase comparable restaurant sales depends on many factors, including … perceptions of the Chipotle brand and the safety and quality of our food, which may continue to be adversely impacted by food safety incidents…"
- "further instances of food-borne or localized illnesses associated with our restaurants would result in increased negative publicity and further adverse impacts on customer perceptions of our brand, which would likely result in further declines in our sales. … any future occurrence of food-borne illness associated with our restaurants—even incidents that may be considered minor at other restaurants—would likely have an even more significant negative impact on our sales and our ability to regain customers. …"

52. During a February 2, 2016 earnings call, Crumpacker stated "our research also indicates that once consumers are aware that food safety issues have been resolved, that many of them will come back into our restaurants. … ***What is most important is that we have implemented a comprehensive food safety plan***."

53. Moreover, on January 8, 2016, a class action complaint was filed against Chipotle in the Southern District of New York on behalf of investors, alleging that Chipotle and certain of its executives (including Ells, Moran and Hartung) knowingly misled investors as to Chipotle's

food safety compliance and the existence of foodborne illness outbreaks. Defendants thus knew that disclosure of this information was of the utmost importance to investors.

54. Chipotle responded to the 2015 foodborne illness crisis with widely publicized measures that the Company touted as improvements to its food safety protocols. In a publicity stunt, on February 8, 2016, the Company closed all of its restaurants for several hours for an all-staff meeting regarding food safety. In addition, Chipotle asserted that it had implemented a number of changes to policies at the Company's restaurants—for example, requiring all employees to wash their hands every half hour, mandating that two employees verified that certain ingredients had been immersed in hot water for at least five seconds to kill germs, and using Pascalization to pre-treat food ingredients.

55. For example, the Company stated: "As a restaurant company, nothing is more important to us than serving our guests food that is delicious and safe to eat. Since this incident began, we have significantly increased our efforts to ensure that our teams are adhering to all of our food safety protocols. … Among the new or enhanced programs we have put in place include … enhanced internal training to ensure that our teams understand and adhere to all of our food safety standards."

56. During 2016, Chipotle also ran a massive marketing campaign that was braod reaching, with more than 90 million impressions, designed to convince the public that Chipotle had implemented its food safety protocols and that "our food is as safe as possible."

57. By touting these measures, along with free food promotions and increased advertising, Chipotle aimed to restore customer confidence in the safety of its food.

**Chipotle Failed To Provide The Staff, Training and Resources**
**<u>Necessary To Implement Its Food Safety Protocols</u>**

58. According to confidential witnesses, Chipotle's announcement of new food safety protocols were "window dressing" that did not address underlying problem at Chipotle – the failure of management to provide resources to properly staff the restaurants and train employees on food safety. Despite announcing new food safety protocols, the Company never provided the restaurants with the resources to train and implement those protocols. When the lack of resources inevitably resulted in widespread failure of food safety audits and sever foodborne illness outbreaks, the Company refused to fix the problem, continuing to understaff restaurants and deny the labor hours necessary to implement the new food safety procedures.

59. While Chipotle announced in early 2016 that all General Managers and Field Leaders (also called Area Managers) would be certified in HACCP, CW4 stated that that was simply "window dressing" designed to repair investors' confidence in the Company's ability to handle food safety problems. "It was fluff," CW4 said. "I'm calling it what it is." Moreover, CW4 explained that by August 2017, none of the General Managers had been trained and Chipotle still had not completed the training for the Field Leaders.

60. According to CW4, the new food safety protocols implemented after the 2015 crisis did not address core problems at Chipotle – insufficient labor hours to conduct food safety training and understaffing of the restaurants. CW4 said the Company did not invest enough in staff to address foodborne illnesses.

61. According to CW4, the food safety problems and foodborne illnesses were seen within the Company as a symptom of "insufficient training" in food preparation techniques as well as a training staff shortage and fledgling workforce due to a "systemic lack of organization"

and systemic understaffing of restaurants. "They were understaffed. The training was insufficient, and so was the food inspection," CW4 said. "The reason that the stores were having employees sick, especially in the north and northeast, was that they had more difficult labor markets. They were shorthanded and not trained properly," CW4 said.

62. CW6 also stated that Chipotle did not provide the staff, training or resources to implement the food safety protocols it announced. "That's how problems can occur," CW6 said. "[O]n the ground, they (Chipotle) don't do a very good job making sure their restaurants are properly staffed and adequately supported." "What was not sufficient was making sure they had fully staffed restaurants and people to actually make sure that the system they put in place, that these systems can actually be executed."

63. According to CW6, Chipotle did not ensure food safety protocols were fully implemented. The issue, CW6 said, was that the Company's executives did not create or support a system that ensured its restaurants were adequately staffed so employees would have enough time to properly learn and execute the safety protocols. "They just implemented all of these policies," CW6 said. "But you need a system to go along with those policies. To make sure those policies were being done on a regular basis. To make sure the food safety system we have in place is sustainable…. They don't have a sufficient system in place to make sure it's done every time."

64. CW5 said that prior to the 2015 crisis, Chipotle did not have a training department that adequately provided food safety instructions to its employees. CW5 recalled noticing that the Company did not have protocols at its restaurants that most other restaurants practiced. CW5 said that after the crisis, Chipotle implemented a number of improved protocols, but the training

department never developed the capacity to do the training or even support the operations side in doing the training for food safety. "It wasn't their deal," CW5 said.

65. Instead, according to CW5, the Company pushed the training responsibility onto the operations side of the Company. Managers at the restaurant level were supposed to teach staff about the new safety protocols and enforce the rules. CW5 said the training department did not offer support to operations in training employees because the Company did not have the staff in the training department to do that. CW4 confirmed that even after the 2015 crisis the Company continued its long-term practice of not investing or prioritizing labor and training.

66. CW7 also said that Chipotle's management did not provide adequate support for the restaurants to be able to roll out and implement the new food safety protocols. During 2016, the Company "rolled out about 60 to 70 new procedures," yet it did not change its restaurant staffing model or manager support network to aid with the training and implementation, CW7 said. Chipotle announced the procedures "without giving them more hours, without giving them more help … I saw my crew members suffer, I saw my GMs suffer. I was suffering", CW7 said.

67. CW8 and CW9 likewise confirmed that when the new food safety protocols were rolled out in 2016, the Company did not implement any staffing changes or allow for extra labor hours for training to ensure the new food safety protocols were understood and implemented to prevent violations and foodborne illnesses. CW9 "didn't really feel support" from upper management to improve the difficult situation in Minnesota, so he resigned.

***Chipotle's Practice Of Severely Understaffing Restaurants Prevented Compliance with Food Safety Practices***

68. Confidential witnesses all stated that management systemically understaffed restaurants, which prevented employees from receiving the required food safety training and from employing proper food safety techniques.

69. CW9 stated that Chipotle management did not provide sufficient personnel to ensure the new food safety protocols were understood and implemented to prevent violations and foodborne illnesses.

70. Indeed, CW6 and CW8 each said that the understaffing became significantly worse after the 2015 outbreaks and decline in sales and stock price because the Company began to pressure its managers to save on labor costs. CW6 recalled the Company subsequently imposed a tight labor budget. "There was a lot of pressure on the management team to control labor," CW6 said. "When you're trying not to overspend on labor, and you're trying to train people, it's almost impossible to do," CW6 said. CW6 said the Company should have been "spending money internally to make sure staff is prepared or trained properly, make sure they had enough staff to uphold these (new food safety) standards." "Once the stock price was driven down, there was a big push on making sure we hit labor (budgets) and didn't have a bunch of overtime," CW8 said. "The Field Leaders and GMs were trying to get what they needed to get done, but (the tight labor budgets) put a little bit of pressure on them," he said. "How are they going to get (the extra work) done without extra help?"

71. CW9 said that restaurants he oversaw were severely understaffed and lacked quality leadership. Usually, restaurants were operating at 70 percent of the Company's staffing model, CW9 said. There were days when CW9 called the Team Director, Saul Muniz, to say, "We can't open," because they were so short staffed. Trying to train new employees without quality managers while a busy restaurant is so short-staffed was highly problematic, CW9 said. "In a restaurant situation like that, there was never enough time to train," CW9 said. "And I didn't have anyone I was confident in enough to do the training expect for me."

72. CW4 also said that Chipotle "chronically understaffed" restaurants, which overburdened the employees and crippled food safety. "If I have a restaurant that's understaffed, then that's a danger right there," CW4 said. Employees who are overburdened do not have as much time to ensure that the food safety protocols are being followed fully, CW4 said. CW4 also noted that employees at restaurants that are short staffed were under pressure not to take a sick day even if they are sick, especially managers on salary.

73. CW2 confirmed that understaffing was a major problem, stating that "my whole area was a disaster."

74. CW6 and CW7 likewise each stated that the biggest problem at Chipotle was the lack of adequate staffing and leadership to manage the restaurants. CW6 said that a fully staffed restaurant should have about 30 employees but, usually, a location was operating with only about 22 to 25 employees. With such a thin staff, CW6 said it was "very difficult" for employees to follow the new food safety protocols. Without a full staff, the employees were already overburdened prepping food, cooking, serving and clean-up. During a lunch or dinner rush, employees would barely have time to keep up with customer orders, so they were known to take short cuts on the food safety protocols, CW6 said.

75. "There were some severely, severely understaffed restaurants," CW7 said. Indeed, three of the six restaurants in and around Philadelphia did not even have a General Manager for much of CW7's time with the Company. The three restaurants without a General Manager were also understaffed, including one which was so understaffed and without leadership that CW7 had to work seven days a week there for a month doing all levels of employee work, including cooking the food. Another one of CW7's severely understaffed

restaurants only had nine employees. It was run almost entirely by "an outside crew we had to scrounge up" temporarily from other area restaurants.

76. Even after the 2015 foodborne illness outbreaks at Chipotle, CW7 was left on his own and not given adequate support, help or guidance on how to deal with the extreme level of understaffing and lack of adequate leadership at the restaurants. CW7 was particularly shocked after working at a single understaffed restaurant every day for seven days a week from 7 am to 12 am without a General Manager that Chipotle management provided no assistance despite CW7's regular requests for help. "I thought it was completely ridiculous that you can't get someone to come to the restaurant to fix it," CW7 said. "They expect Area Managers to do it with no help and no guidance whatsoever." CW7 recalled that the Executive Team Director, Andrew Kellogg, visited the severely understaffed restaurant and was aware of the problems with understaffing and lack of leadership there.

77. As a General Manager, CW6 was also required to do two food safety audits per month as part of the new protocols put in place in 2016. But "it was difficult to do a food safety audit when you don't have enough people" working in the restaurant to maintain basic operations at the same time.

78. According to CW7, in addition to lacking the time to train employees in new food safety protocols, the understaffed restaurants also struggled to keep up with implementing the protocols. CW7 also stated that food safety training suffered due to chronic understaffing by management. Due to the staffing shortages at the restaurants, particularly the busy ones, CW7 said it was difficult for the managers to properly train its staff on the new food safety protocols.

79. CW8 also stated that many Chipotle restaurants were understaffed and struggled to train employees on food safety. Restaurants in CW8's region were chronically understaffed

and lacked General Managers for long periods. One restaurant was down 15 employees from what the Company's staffing model called for. "When you're supposed to have 10 people working, and you only have four there, you skip stuff because you don't have time to do everything," he said, suggesting what a busy employee might experience: "I'm supposed to take my gloves off and wash my hands, but I can't because I have customers waiting."

80. CW8 noted managers at restaurants at understaffed restaurants also did not have time to properly train employees. "You just hired somebody, but you don't have time to train them," CW8 said. "Or you give them half training, which is worse." Employees without full training were thrown into the mix and asked to do a job they did not have all the skills or knowledge to do, CW8 said. The lack of training left new employees frustrated and unprepared to handle their jobs, leading some to quit and adding to the high turnover problem at the Company.

***Chipotle Refused To Provide Additional Labor Hours To Train Employees On Food Safety Procedures***

81. Confidential witnesses also stated that the inability of understaffed restaurants to comply with food safety procedures was compounded by the fact that management refused to permit the managers additional labor hours to train employees.

82. Even more problematic for understaffed restaurants, according to CW4, was the inability to train new employees. If the staff was already overburdened, training a new employee on top of that was even more difficult, CW4 said. Similarly, CW6 said understaffing "made it difficult to train people on the food safety procedures." New employees were needed to work right away, which made it difficult to take long periods to train them to ensure they fully understood the food safety protocols, said CW6.

83. CW8 estimated that about 85 percent of Chipotle restaurants struggled to train new employees and current employees on the new protocols. CW8 said that those teams needed more labor hours to be properly trained.

84. Nevertheless, Chipotle provided no extra food safety training after the 2015 outbreaks, CW4 said. At other chains (at which CW4 has worked over the last 30 years) when a new employee is hired, the companies allowed managers to schedule 10 to 20 training hours for that employee that are in addition to the number of hours normally used to run the restaurant. "You're getting extra hours to train the new employee to learn their tasks," CW4 said. "The person has lots of time to learn the job." The extra time would allow the employee to go through training practices, watch training videos, shadow other workers, ask questions, learn all aspects of their job. However, at Chipotle, the Company did not allow restaurant managers to schedule those extra training hours when hiring a new employee, CW4 said. "The initial training was lax," CW4 said.

85. The lack of training became significantly worse during the Class Period. According to CW4, after the foodborne illnesses of 2015, Chipotle tightened the labor budget even further, preventing adequate training of employees on food safety. After the crisis when sales plummeted, "every dime and nickel counted," CW4 said. Managers were under much more pressure from the Company after the crisis to stay within their labor budgets, and they faced more scrutiny and negative attention if they blew their labor, even if it was to train a new employee, CW4 explained. After the 2015 crisis, if a manager did not consistently hit the labor budgets they could lose their job, CW4 said. "After the crisis, it was, 'If you're not able to hit our business model, we need to make sure we have someone who can execute,'" CW4 recalled. "It went from it's all about the people to it's all about the numbers."

86. CW4 said that the Company's policy of not allowing extra hours to train new employees undermined the Company's efforts to improve its food safety protocols. CW4 said it was a continuation of the Company's long-term lack of investment in training. "What the problem was and still is, the Company never invested in proper training for employees," CW4 said.

87. According to CW4, employee scheduling software used at Chipotle limited flexibility. Chipotle used employee scheduling software (either MenuLink or eRestaurant) that was on the Company's internal computer system, CW4 said. When a General Manager of a restaurant sat down to schedule a work week, they would input the restaurant's sales volume and the software would determine how many labor hours were allowed by the company to operate the restaurant. CW4 believed that the labor numbers were set at corporate headquarters in Denver. CW4 said the Company did not allow managers to add training hours for new employees. Whatever the software said was the proper number of hours for a restaurant that was the maximum amount managers were able to schedule.

88. When managers questioned the policy, and requested the extra training hours, the Company refused to permit any additional hours for food safety training, according to CW4. "You schedule what we're telling you to schedule, that should be enough to train and onboard new employee," CW4 said, referring to the Company line. "That's what everyone was being told. That's what the executives said if anyone said I need extra hours to train."

89. From CW4's experience at Chipotle, however, the restaurants were already run very tight on labor (in addition to being understaffed), so asking restaurants to train new employees without those extra training hours created a situation at restaurants, especially busy ones, where new employees were not getting proper training, CW4 said.

90. CW7 and CW8 each also confirmed that the Company did not permit additional labor hours to train new employees. "There's no allowance for that," CW7 said of extra training hours. "It's manageable in a slow restaurant. In a busy restaurant, it's definitely trouble." CW8 said that "really, really well run restaurants" that were fully staffed with quality employees could handle training a new employee without additional labor hours. But CW8 said those restaurants made up only a "small minority" of Chipotle restaurants.

91. CW9 likewise stated that Chipotle management did not provide sufficient resources to ensure the new food safety protocols were understood and implemented to prevent violations and foodborne illnesses. Chipotle's training system was not adequately structured so that all employees could fully learn the food safety protocols and how to implement them, CW9 said.

92. CW9 recalled the meeting on February 8, 2016 when the Company closed all of its restaurants a couple hours for an all-staff meeting regarding food safety. CW9 said that the Company announced it would have new protocols but did not have a new training plan in place to ensure everyone could learn them. "All these changes are going to come right now," CW9 said, recalling what the Company told employees. "We'll do a quick meeting about it. Everybody is expected to learn these things. Good luck." CW9 said it would have been better to roll out the new protocols along with new food safety or quality assurance teams that could visit restaurants to do hands-on training with the managers and employees instead of relying on employees to learn all the new protocols simply by watching a video once.

93. CW2 also said that the Company's lack of support undermined the implementation of the new food safety protocols in the field. CW2 said that the when the Company announced all the new protocols in February 2016, it was like "drinking water from a

fire hose." CW2 said management and staff at restaurants were not always certain about what they were supposed to do or how to do it. "It was confusing for the team to go from zero to 90mph without having the proper training," CW2 said.

94. CW2 said that restaurant teams in the field were not given time to properly train employees in new food safety protocols. CW2 said, "There was never really enough time," to take restaurant staff aside and fully train them on the new food safety protocols before the staff is put back on the food prepping, cooking and serving lines.

95. "The Company was creating all this stuff, blowing it to the field, and the Executive Directors and Directors were responsible for making sure the field team was trained, and the Area Managers team were doing things right. But the directors were not doing that. I don't recall ever spending any time with my director where she was ensuring I was fully knowledgeable about making sure the General Managers were doing what they were supposed to be doing." "I didn't know if we were doing things the right way, not doing things the right way," CW2 said. "They didn't provide the help and the feedback to make sure we were doing things the right way."

***Chipotle Employees Would Regularly Fraudulently "Pencil Whip" Temperatures***

96. CW3, CW5, CW6 and CW7 all confirmed that because of understaffing and lack of food safety training, restaurants would regularly falsify food holding temperatures as being compliant through a process that was widely referred to within the Company as "pencil-whipping."

97. Chipotle, like all restaurants, was required by law to keep hot food at or above 135 degrees, and cold food at or below 40 degrees. If hot food falls below 135 degrees or cold food increases above 40 degrees it becomes a cause of foodborne illness.

98. According to CW1, CW3 and CW5, each restaurant was required to take the temperature of certain food stations (e.g. steak and chicken) throughout the day -- before the noon-2 p.m. peak time, and before the 5:30-7:30 p.m. crowd, and again immediately after the peak times -- and record those temperatures and times in a spiraled bound book (referred to as the "little black book"), which was mailed to Chipotle corporate in Denver.

99. CW3 said that food workers were instructed to falsify the reported temperatures for meats on the grill. "Meats, and beans, were supposed to be at certain temperatures. The same with cold food. If temperatures were a little low, they'd put the wrong temperature in there (the little black book) just to get it over with. They always told you to stick a number in there that was a couple of temperatures (degrees) higher." According to CW3, "If it was supposed to be at 80 degrees, and it was 60, they'd tell you to go as close to 80 as possible in the book," she said. "There were little boxes in it, that we would initial and put the time in," CW3 said. "There wasn't a lot of training on filling out the book."

100. CW5 confirmed this common practice and stated that it was referred to within the Company as "pencil whipping" -- filling in false numbers and times in the log book. CW5 was able to spot suspicious numbers in the log books. For example, CW5 would see 25 entries for temperatures taken all within one to two minutes of each other. "You can't take 25 temperatures in one to two minutes," CW5 said. During visits, CW5 would discover that the meat was as much as 30 degrees cooler than it should have been according to the falsified log book.

101. CW6 also confirmed that it was obvious from looking at the entries in the log book that staff filled in fake temperatures, and that it was referred to as "pencil whipping." CW6 said this practice was the result of the Company's practice of understaffing the restaurants. "That's part of the problem when you don't have time without an adequate staff to do

everything," CW6 said. "'Oh man, I forgot to take temperature.' So, you had to pencil whip – just writing down temperatures in the book to make sure it's complete." "Many people would feel the pressure to pencil whip," CW6 said.

102. CW7 also said busy, understaffed restaurants were known to "pencil-whip," or write in phony temperature numbers in the temperature log books. "That's something I did see," CW7 said. "I caught people doing it. I've called managers on that." CW7 said a series of temperatures that were whole numbers was a sign that the employees were pencil-whipping. The falsification of temperatures was widely known at Chipotle. CW7 said other Area Managers discussed pencil whipping.

***Chipotle's Food Safety Audits Revealed That The New Food Safety Protocols Were Not Being Implemented***

103. According to CW2, CW4, CW5, CW7, CW8 and CW9, after the Company announced the new food safety protocols, Area Managers were required to visit each of their restaurants once a week to conduct a food safety audit (the "Weekly Food Safety Audit"). In the audit, the Area Managers would check temperatures of grilled and ungrilled products, make sure employees are properly handling and storing food, keeping dishes clean, washing their hands frequently, and examine the "little black book" to see if it was filled out correctly. In addition to the Weekly Food Safety Audits conducted by Area Managers, the Company's corporate-level SSR Department also conducted food safety audits of each restaurant every quarter (the Quarterly Food Safety Audit"), according to CW2, CW5 and CW8. CW5 said that the audits scored restaurants on how well they were implementing all of the food safety protocols, and that a passing score was 80.

104. Starting at the beginning of 2016 and continuing through July 2017 when CW5 left the Company, a large number of the Chipotle's restaurants were completely failing the

internal food safety audits. As an Area Manager, CW5 was shown the average scores for other Area Managers. For example, in San Diego, CW5 was able to see scores for the 64 restaurants overseen by Grayhall. In Riverside, CW5 was able to see the scores for the 42 restaurants overseen by Kimberly Lara-Kane, a territory called the Inland Empire. CW5's territory, overseen by Lara-Kane, had about 35 to 40 percent of its restaurants failing their audits on a regular basis. "A good 35 to 40 percent were not passing", CW5 said. This failure rate continued until CW5 left the company in July 2017.

105. Even more shocking, this 35-40% failure rate was actually the best regional rate for Chipotle. CW5 stated that the entire region, which was called the Pacific South, which was Tonya Poirier's territory, was leading the nation in its average scores for restaurant safety audits. CW5 noted that the worst regions were in the Midwest. "Our score was 30 points higher on average than say the Chicago, Midwest areas," CW5 said. An Area Manager in the Chicago area (who was CW5's friend) told CW5 that his wider territory had 65 to 75 percent failure rates in its restaurants. CW5 said typically the big problems that caused the failures were not keeping food at proper temperatures, employees not washing their hands as required and dirty dishes. These are all practices that lead to foodborne illness outbreaks such as norovirus.

106. CW4, CW7 and CW8 each stated that the high food safety audit failure rates were the result of the chronic understaffing and lack of training. CW4 said Chipotle's weekly food safety audits documented the effects of understaffing and the restaurants that had problems were almost always the ones that were understaffed. CW8 said the understaffing's impact on a restaurants' ability to execute on the new food safety protocols showed up in weekly audits and that the understaffed restaurants had lower scores. CW7 observed that employees at the understaffed restaurants were less likely to know or understand the new food safety protocols. "I

saw it first hand," said CW7, who conducted the weekly audits. "It was nearly impossible for everyone to learn everything." At busy understaffed restaurants, it was ***impossible*** to train employees and educate them on the food safety protocols, CW7 said.

107. CW7 stated that the food safety deficiencies were so severe in early 2016 that in the summer of 2016, despite the chronic understaffing, Chipotle fired 5 or 6 General Managers in the Philadelphia region alone for poor food safety practices. According to CW7, these terminations of experienced managers compounded the understaffing and food safety problems. "When you leave a restaurant without leadership, then you have a restaurant with more trouble," CW7 said.

108. Asked to explain why so many restaurants were still failing food safety audits throughout 2017, CW5 said part of the problem was a poor food safety culture, bad morale and a "push back" from restaurant employees and even some Area Managers about all the new protocols.

109. CW5 noted that prior to the 2015 crisis, the Company had a "lax" attitude about food safety. After working in other restaurant chains, CW5 was surprised that Chipotle did not do some of the standard protocols practiced in the industry. Due to the Company's lax attitude, a culture developed at the Company for 20 years that was not oriented around food safety. So, when the Company began to implement a number of new requirements of employees, the employees resisted it and did not understand the importance of it. "The culture was lax in food safety to begin with," CW5 said. "When they implemented these things, of course there was huge push back from the ground crew. They weren't used to having to do this stuff before."

110. Some Area Managers who had come up through the ranks at Chipotle also pushed back, agreeing with the restaurant-level employees that the new tasks were burdensome and

possibly unnecessary. “They kind of sided with their subordinates, agreeing that, ‘This is a pain in the ass,’” CW5 said. “You’re trying to turn these 50,000 employees to be food safety conscious, and you’re getting push back from the Field Leaders out there.” CW5 said this culture undermined the Company’s efforts to improve food safety practices at their restaurants companywide.

**Chipotle’s Failure to Implement The Food Safety Protocols**
**Resulted In Many Foodborne Illness Complaints and Outbreaks**

111. Departments of health from around the country alerted Chipotle that poor food safety practices in the Company’s restaurants were the cause of a number of norovirus and Salmonella outbreaks in 2016 and 2017. Outbreaks that the Company never disclosed.

112. CW9 stated that in 2016 customers began filing many more food borne illness complaints against Chipotle with local health departments throughout the country. The health department inspectors were at the restaurants enough times that CW9 got to know all of them by name.

113. This is confirmed by data collected by IWasPoisoned.com, a website that allows people to self-report suspected foodborne illnesses and which has a track record of accurately spotting illness outbreaks even before health officials or restaurant managers are aware (including the July 2017 outbreak at Chipotle in Sterling, VA). In 2016 and 2017 the number of foodborne illness complaints against Chipotle submitted to the website ranged between nine times and fifty times higher than Chipotle’s peers (Taco Bell, Wendy’s, McDonald’s, Burger King, KFC, Domino’s Pizza, Pizza Hut, Little Caesars Pizza, Subway and Dairy Queen).

114. The sharp increase in foodborne illness complaints coincided with Chipotle’s rampant understaffing, lack of training, and high food safety audit failures, all of which the confidential witnesses have said resulted in food safety violations. Indeed, as discussed below,

the Minnesota Department of Health conducted an inspection of one of the Chipotle restaurants managed by CW9 and determined that an outbreak of norovirus was the result of a Chipotle employee coming to work sick and handling food served to customers without even washing their hands.

***Maryland Outbreak***

115. According to CW8, a Team Director located in Maryland told CW8 that one of the restaurants he managed in Columbia, MD (which was known as the Columbia Mall location) caused a food-borne outbreak in 2016, which was investigated by the local health department.

***Michigan Outbreak***

116. In mid-2016 the Washtenaw County Public Health ("WCPH") in Michigan concluded that a Chipotle restaurant was the cause of an outbreak of Salmonella Lomalinda.

117. A "Foodborne Illness Report" prepared by the WCPH documented the department's investigation and conclusions. In mid-2016, the Michigan Department of Health and Human Services ("MDHHS") notified WCPH of three cases of Salmonella Lomalinda. After interviewing the three infected individuals WCPH concluded that "***the only common exposure was Chipotle Mexican Grill***." All three individuals reported visits to Chipotle in the week before the onset of the illness.

118. WCPH conducted a detailed environmental investigation at the Chipotle location as well as a follow-up site visit. WCPH identified at least seven food safety violations:

1. Blanched red onions were above permissible temperatures.
2. Guacamole was stored at above permissible temperatures.
3. Cooked chicken was found on the front prep line below the required minimum temperature of 135 degrees for hot holding
4. The prep table was improperly cleaned and sanitized using a solution at a concentration of less than 100 ppm Quaternary Ammonium. Food debris was observed to remain on the table after the cleaning process

5. Cutting boards in the food prep area were found with food debris residual

6. Large roll of plastic wrap on the prep table is used for on both raw chicken and ready to eat foods, and the plastic wrap role housing was found with residual of food debris.

7. The small stainless steel table next to the grill where pans of chicken are placed to be grilled was found with rice on the surface and the rice cooker is left uncovered exposing the food to potential contamination.

119. A conference call was held between WCPH and representatives of Chipotle to discuss the outbreak and violations. WCPH communicated with Roslyn Stone of Chipotle, who also informed James Marsden and Aruro Tanus of the outbreak. In response to this outbreak, Chipotle had Marsden and Tanus write a "White Paper" on Salmonell lomalinda, which Stone provided to WCPH.

120. The Michigan Department of Health concluded: "***In this S. Lomalinda cluster, the likely exposure occurred at Chipotle Mexican Grill***, with possible contaminated foods including chicken, black beans, guacamole, pico de gallo, lettuce and cheese. ***"[t]he out-of-compliance observations referenced under food safety are indicative of an increased risk for foodborne illness***."

***Minnesota Outbreak 1***

121. On December 19 and 20, 2016, the Minnesota Department of Health ("MDH") foodborne illness hotline received complaints from individuals from six separate households that they developed gastrointestinal illness after eating together at Chipotle (3780 Marketplace Dr.) in Rochester Minnesota on December 15, 2016. A complainant also reported knowing others who were at the restaurant at the same time and who had also become ill after their meal. A complainant also reported that while at the restaurant, another patron vomited. MDH visited Chipotle on December 19, 2016, informed the Company of the outbreak, interviewed employees,

asked about patron complaints, implemented an employee illness screening form, and evaluated food preparation and handling procedures.

122. Five of the ill patrons were interviewed and four met the "case definition" – "The median incubation period from the Chipotle meal was 34 hours (range, 31 to 44h hours). The median duration of illness was 12 hours (range, 3 to 12.5 hours). All four cases reported diarrhea and cramps, three vomiting (75%)." MDH collected stool samples, which were submitted to the MDH Public Health Laboratory ("PHL") for viral and bacterial testing. The samples tested positive for norovirus GII.

123. In addition to the patrons who contracted norovirus, MDH discovered that four employees reported recent illness, including vomiting and diarrhea days before and after December 15, 2016. At least one of the individuals did not report their symptoms to management. As discussed in official report titled "Foodborne Outbreak of Norovirus Associated with Chipotle, Rochester, Minnesota, December 2016", upon inspection of the restaurant, MDH discovered "[t]he restaurant was not maintaining an illness log onsite (employee reports of illness were being tracked at the Chipotle Corporate office)."

124. The conclusion of the report was clear: "***This was a foodborne outbreak of norovirus associated with Chipotle in Rochester. An ill or recently ill foodworker was likely the source of illness…***"

***Florida Outbreak***

125. On January 9, 2017 there was another norovirus outbreak affecting at least 12 people, which the Florida Department of Health ("FDH") traced back to the corn salsa and lettuce served at a Chipotle restaurant located at 1000 South State Road 7, Unit 2 in Wellington, Florida. The FDH reported the "outbreak" to Chipotle and inspected the Chipotle location on

January 13, 2017. ***The FDH concluded that the food was contaminated as a result of an infected employee preparing the food with their bare hands***.

***Minnesota Outbreak 2***

126. On February 26, 2017, Patrick Quade of IWasPoisoned.com informed MDH that he had received three independent reports of foodborne illness from individuals that ate at Chipotle in Rogers, Minnesota (in Hennepin County) on February 23, 2017.

127. As memorialized in MDH's emails and reports, on February 27, 2017, the MDH foodborne and waterborne illness hotline was forwarded from Roslyn Stone of Corporate Wellness and Haleigh Harren of Chipotle SSR Department in Chipotle's corporate offices information on two independent complaints (of at least four individuals) made to Chipotle's website and informing MDH that five employees had called in sick over the previous few days. The complainants reported eating at the Chipotle location on February 23, 2017. Additionally, Chipotle reported that seven employees had recently reported gastrointestinal illness.

128. A case was defined as "a Rogers Chipotle patron who subsequently developed vomiting and/or diarrhea (3 stools in a 24-hour period) after eating food from the restaurant." Stool samples were collected and submitted to the MDH Public Health Laboratory for bacterial and viral testing. The stool specimens were positive for norovirus GII.4 Untypeable.

129. Four patrons from the original complaint and 27 patrons identified through online order receipts were interviewed. Twelve (39%) of the individuals met the case definition. Eleven (92%) reported diarrhea, 10 (83%) vomiting, 8 (67%) abdominal cramps, and 6 (50%) fever. The MDH determined "The median incubation time from the Chipotle meal was 36 hours (range, 24 to 48 hours). The median duration of illness was 32 hours (range, 12 to 69 hours) for the eight cases who had recovered by the time of the interview."

130. The MDH interviewed all of the restaurant's 23 employees and discovered that 10 employees reported recent gastrointestinal illness that met the case definition. One employee was ill with vomiting and diarrhea on February 13. Another had vomiting on February 20 and diarrhea on February 21. One employee reported vomiting on February 24. Five employees reported vomiting and diarrhea on February 25. And two employees reported vomiting and/or diarrhea on February 26.

131. The "Conclusion" of the MDH's report titled "Norovirus Gastroenteritis Associated with Chipotle, Hennepin County, February 2017" was "***This was a foodborne outbreak of norovirus gastroenteritis associated with the Rogers Chipotle***. … ***An ill or recently ill foodworker was the likely source of the illnesses.***" MDH was in regular contact with Roslyn Stone throughout the investigation and the final report was sent to Roslyn Stone of Chipotle corporate.

**Chipotle Corporate Was Aware of The**
**<u>Understaffing and Food Safety Problems</u>**

132. As discussed below, confidential witnesses stated that the Defendants were well aware that the Company's practice of severely understaffing its restaurants and refusing additional labor hours to train employees on the new food safety procedures was resulting in massive failures in food safety and foodborne illness outbreaks across the country.

133. Indeed, in the wake of food-borne illness incidents that had a significant negative impact on Chipotle's business during 2015 and into 2016, the Audit Committee and management agreed on additional procedures to enhance the committee's oversight over food safety risks. This enhanced oversight involved increased reporting to the Audit Committee regarding food safety-related matters, as well as participation by members of the Board in food safety audits, trainings, and other activities. Specifically, the Board designated Charlesworth as the principal

liaison to the Audit Committee in connection with its enhanced food safety oversight role. Chipotle also stated in its 2016 10-K that "Our quality assurance department establishes and monitors our quality and food safety programs…"

***Defendants Were Aware Of The Chronic Understaffing Of Restaurants***

134. According to CW4, Chipotle management tracked business metrics on each restaurant. Field Controllers in each region of the country crunched the numbers for restaurants and tracked multiple metrics and trends: "You wouldn't believe it if you saw it," CW4 said. "They had massive spread sheets for everything. They were combing through everything. There were 100s of spread sheets." Chipotle tracked "trends on how busy each store was, whether it was busier on a Monday versus last Monday, show trends on how well the stores are getting with customer feedback, anything you could think of they were quantifying it," CW4 said.

135. Specifically, CW7 and CW8 each recalled the Weekly Staffing Reports, which were kept in the Company's internal computer system and updated daily, identified which restaurants were understaffed and by how much. CW7 and CW8 said the reports showed the number of employees that each restaurant should have based on its sales volume and Chipotle's staffing model. The staffing model allotted a specific number of employees and labor hours per shift and week that the Company determined was adequate to run the restaurant. CW7 and CW8 said the report also showed which restaurants were understaffed according to the Company's staffing model and by how much. For example, according to the staffing model, the Exton, PA restaurant, which had a sales volume of about $7,000 a day, should have had 30 to 35 employees. "There was a point when we had 15," CW7 said.

136. CW7 and CW8 each stated that the Weekly Staffing Reports were available to upper management, General Managers and above, at all times, and CW7 said that it was likely

that the Individual Defendants were aware of the staffing shortages and the accompanying problems. CW7 said the concern about understaffing was companywide, recalling that understaffing became a focus of attention at the Company during the summer of 2016. When asked if Ells, Moran and Hartung knew about the understaffing problems, CW7 said, "I'd be really surprised if they didn't (know about the shortages). It's their company. They should be looking at the reports. If they are looking at this and not realizing there's a problem? Everyone should have been aware of it."

137. CW2 said that the Company also held formalized "People Planning" sessions with all of its Area Managers once a quarter. "The Area Managers had to present their areas to their [Team] Director, Executive [Team] Director, the recruiting manager, HR, finance and Gretchen [Selfridge]," CW2 said. The meetings were held at a hotel conference room, where CW2 sat across a large table from the higher-level executives. Each Area Manager would have about an hour in the room, during which time they would go over the status of their area restaurants, trouble spots, and planning for the future. CW2 said the executives would have reports about the sales, staffing and other operational information for the restaurants. During these meetings, CW2 recalled reporting several of CW2's restaurants were understaffed. "We would talk about our staffing needs from a management standpoint," CW2 said. "We couldn't help but talk about it. They would see the same thing" in the staffing reports submitted for the presentation.

138. Indeed, CW8 said all Team Directors met with the Executive Team Director, the regional recruiting team and the Field Controller, Michael Evans, bi-weekly to discuss the understaffing problem.

139. CW8, Team Directors and Executive Team Directors also met with the co-CEOs Ells and Moran to discuss the understaffing problems. CW8 recalled two specific meetings with the senior executives when the topic was discussed.

140. In November 2015 and November 2016, the top executives held meetings with all of the regional teams in the Company. CW8 along with his fellow Team Directors and their Executive Team Director, Andrew Kellogg, met for about three hours with Ells; Moran; Spong; Mike Duffy, Restaurant Support Officer; Gretchen Selfridge, Restaurant Support Officer; Mark Crumpacker, Chief Marketing and Development Officer; and a few other top executives. CW8 said the lead recruiter for the region was also at the meetings. CW8 said during the meeting in November 2016, the Team Directors raised the problem with understaffing at their restaurants.

141. Despite the rampant understaffing and resulting food safety problems, CW8 could not recall any changes or additional support provided to the field after the meetings to deal with the understaffing problems. CW8 said that although Moran had agreed that the field needed more support, once everyone was back in the field, nothing was done differently. "Even if they said, 'Yeah, spend more on labor,' in that room, it would be a different story when you got back to your region," CW8 said. CW6 likewise complained about the understaffing to his boss, Drexel Jones, but nothing was ever done.

142. Likewise, CW7 and the other Area Managers discussed their frustrations with understaffed restaurants with their Team Director on multiple occasions, but the problem was never addressed. CW7 said upper management at Chipotle acknowledged that the restaurants were understaffed and pushed the problem back onto the Area Managers. "It was easy to point out what was wrong," CW7 said. "But they had no solution on how to fix it."

143. CW7 recalled the Company had one or two "recruiting strategists" in each region who were receiving the "grading" for staffing levels at each restaurant in their region. "The recruiting team was aware" of the understaffing problem, CW7 said. But the recruiting strategists did not do much more than tell Area Managers that they were understaffed and needed to hire more people to "get our restaurants fully staffed." "They would pull up the report, and say, 'This is where the gap is. We need to close this gap,'" CW7 recalled. "That's obvious news. We knew we needed to hire." The problem was having the time and the staff to do the recruiting, hiring and training, CW7 said. "You had restaurants that were barely standing. If you took one person out, and (now) it's crumbling to put (that person) into a crumbling restaurant. All you have is more crumbling restaurants."

***Defendants Were Aware Of The Widespread Failure To Implement Food Safety Procedures and The Resulting Foodborne Illness Outbreaks***

144. CW5, CW8 and CW9 said that all Weekly Food Safety Audits went to the corporate SSR Department. CW8 said all Weekly Food Safety Audits by Area Managers also went to the Team Director and Executive Director. "Everything" regarding food safety audits, inspections, investigations, etc. of restaurants "was funneled into the SSR team" at corporate headquarters, according to CW9. This included the Weekly Food Safety Audits conducted by Area Managers, the Quarterly Food Safety Audits conducted by the SSR team, the third party independent food safety audits that were conducted by EcoSure, and the health department inspections. CW9 said that all illnesses at a Chipotle restaurant were also reported to the corporate SSR Department. "They managed all that data," CW9 said.

145. Chipotle executives tracked the failing results and trends from the Weekly Food Safety Audits and Quarterly Food Safety Reports. According to CW5, each quarter, Chipotle

ranked the 290 Area Managers (i.e. Field Leaders) from 1 through 290. CW5 said that in the rankings in the Quarterly Food Safety Reports Field Leaders could see how they scored in food safety audits in comparison to other Field Leaders.

146. CW2, CW5 and CW8 said that any failing Weekly Food Safety Audit or Quarterly Food Safety Audit was sent to one or both of the co-CEOs Ells and Moran. CW2 said that as soon as a SSR Field Auditor submitted the report of a failed audit, the Company's internal computer system generated an email with the report that was sent to several employees, including one or both of the Co-CEOs.

147. CW2 recalled that whenever a restaurant failed an audit an email about the audit was sent to CW2, the Team Leader, Executive Team Leader, Selfridge and one or both of the Co-CEOs. CW2 had confirmation that Co-CEO Moran received information about failed audits because Moran called CW2's direct manager, Brenda Pereira. Pereira then called CW2 and said Moran had called her about the failed audit at the restaurant. "I just got call from Monty that you failed," CW2 recalled her saying.

148. CW8 confirmed that "[i]f those (audits) are bad enough, they go to anybody who's anybody at Chipotle." CW8 specifically recalled that the results of bad audits on restaurants in CW8's region were emailed to Ells and Moran. "It automatically went to the CEOs," CW8 said, and those audits were also sent to Spong, Head of SSR.

149. CW5 confirmed that Ells was aware of the significant number of restaurants failing the food safety audits, recalling a conference call when Ells discussed it and said he was not happy with the number of restaurants that were failing.

150. According to CW8, despite the serious understaffing and poor food safety audits, Chipotle did not permit restaurants to schedule additional labor hours for food safety training.

151. CW2 likewise confirmed that the restaurant that failed the audit "was absolutely understaffed." Nevertheless, when asked how the Company responded to failed audits, CW2 said, "My director just cussed me out and told me to go over there and fix it." CW2 received no additional support from the Team Leader or the Company as a whole in response the food safety problems identified at the restaurants. CW2 did not receive extra time to retrain employees or extra support to hire more staff. "It was, 'Go fix it,'" CW2 said. "They didn't support me. They just yelled and screamed and cussed because they got a failing score."

152. CW9 similarly "didn't really feel support" from upper management to improve the understaffing and lack of food safety training and compliance. At the very least, Executive Team Director, Saul Muniz, and the Regional Director, Ben Williams, were aware of the dire situation in Minnesota. "We asked about (help) a lot," CW9 said. However, help was never provided by the Company.

***All Health Department Inspections, Investigations and Customer Complaints Were Reviewed By Spong in Chipotle's Corporate SSR Department***

153. CW8 and CW9 said any time a restaurant was inspected by a health department that audit was automatically sent to the SSR team at corporate headquarters. Similarly, CW9 said any time a health department received a complaint from a customer about a Chipotle restaurant and began an investigation, the information was submitted to Chipotle's corporate SSR Department and its top executive, Spong, who is Executive Director Supply Chain and SSR at Chipotle. CW9 stated that Chipotle's SSR Department often took over the responsibility of working with local health departments when an investigation was initiated. CW9 said "I typically got the message from SSR, 'We've got this. Back off.'"

154. CW4 explained that every customer complaint concerning food safety, referred to as "customer incident reports", were also sent electronically to the Spong in the SRR Department in the corporate offices in Denver. "They wanted us to identify everything. Sometimes when you cook raw chicken, you get bones in there once in a while. So, you'd have to fill out a report."

155. Indeed, in the wake of the 2015 food-borne illness incidents, Ells became extremely hands on when it came to the Company's food safety compliance. CW9 recalled one incident when the founder of a company that supplied pork to Chipotle called Ells to report a cleanliness problem at one of the Rochester restaurants. CW9 received a call from his Team Director who instructed him to immediately go to the restaurant to fix the situation.

**Materially False and Misleading Statements Issued During the Class Period**

156. The Class Period begins on February 5, 2016 when Chipotle filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K"), which was signed by Ells, Moran, Charlesworth and other members of the Board of Directors. In the 2015 10-K, the Company stated, in relevant part:

> *Quality Assurance and Food Safety.* We are committed to serving safe, high quality food to our customers. Quality and food safety measures are found throughout our supply chain, from the farms that supply our food all the way through to our front line. … ***Our training, operations, and risk management departments develop and implement operating standards for food quality, preparation, cleanliness and safety in the restaurants.*** Our food safety programs are also designed to ensure that we comply with applicable federal, state and local food safety regulations.
>
> ***
>
> While ***our food safety programs have always been carefully designed and have been in conformance with applicable industry standards***, in response to food safety incidents during 2015 that impacted hundreds of customers we have recently undertaken a comprehensive assessment of our food safety programs and practices. Using the assistance of highly respected experts we performed a review of the ingredients we use, with a goal of designing an industry-leading food safety

> program. ***Components of the new program include*** DNA-based testing of many ingredients designed to ensure the quality and safety of ingredients before they are shipped to our restaurants, ***changes to food preparation and food handling practices***, including washing and cutting some produce items (such as tomatoes and romaine lettuce) in central kitchens, blanching of some produce items (including avocados, onions, jalapenos and citrus) in our restaurants before cutting them, and new protocols for marinating meats. We are also working to enhance our internal controls surrounding food safety by utilizing the Food and Drug Administration's Hazard Analysis Critical Control Point (HACCP) management system. Additionally, we are focused on ***internal training programs to ensure that all employees thoroughly understand our high standards for food safety and food handling***.
>
> ***
>
> As a result of the food safety incidents associated with our restaurants during 2015, ***we have implemented a number of enhancements to our food safety protocols***, and intend to make additional enhancements, to ensure that our food is as safe as it can be.

157. The foregoing representations in ¶ 156 were materially false and/or misleading because the Company had not successfully implemented the new food safety protocols in its restaurants or properly trained its employees to "ensure that all employees thoroughly understand our high standards for food safety and food handling", and because Defendants failed to disclose:

a) that the Company's restaurants were chronically and severely understaffed, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

b) that the Company tightened its labor budget by eliminating food safety training hours for employees, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

c) that the Company's restaurants were widely failing food safety audits that evaluated the restaurants effective implementation of food safety protocols, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

d) that Chipotle had not taken sufficient remediation steps to prevent further outbreaks from occurring;

e) that the Company's employees regularly "pencil whipped" temperatures that were higher or lower than required by relevant food safety standards;

f) that the Company's employees were widely failing their certifications; and

g) that the Company had a poor food safety culture

158. On April 26, 2016, Chipotle issued a press release announcing the Company's financial and operating results for the quarter ending March 31, 2016. Addressing the poor first quarter results from the fallout of the 2015 foodborne illness crisis, Moran stated: "What is most important is that ***we continue to build teams of top performers in our restaurants, and among our field leadership, which will allow us to continue to improve on our already high standards and exceptional customer experience***. We have some of the best employees in the industry, which continues to serve as a competitive advantage, ***and we will continue to invest in our people culture*** to help expedite the next stage of growth for Chipotle,"

159. The foregoing representations in ¶ 158 were materially false and/or misleading because Chipotle was not building teams of top performers in its restaurants on food safety and was not investing in its staff, training and culture, and because Defendants failed to disclose:

a) that the Company's restaurants were chronically and severely understaffed, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

b) that the Company tightened its labor budget by eliminating food safety training hours for employees, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

c) that the Company's restaurants were widely failing food safety audits that evaluated the restaurants effective implementation of food safety protocols, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

d) that Chipotle had not taken sufficient remediation steps to prevent further outbreaks from occurring;

e) that the Company's employees regularly "pencil whipped" temperatures that were higher or lower than required by relevant food safety standards;

f) that the Company's employees were widely failing their certifications; and

g) that the Company had a poor food safety culture

160. On October 25, 2016, Chipotle issued a press release announcing the Company's financial and operating results for the quarter ended September 30, 2016. The press release quoted Moran: "***After successfully implementing an industry leading food safety program***, and as our marketing efforts are driving more people to our restaurants, it is critical that we are prepared to delight customers on every visit. ***We are confident that we have the leadership and teams in place to do just that***."

161. The foregoing representations in ¶ 160 were materially false and/or misleading because Chipotle had not successfully implemented its new food safety program and did not have the staff in place at its restaurants to execute its food safety protocols, and because Defendants failed to disclose:

a) that the Company's restaurants were chronically and severely understaffed, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

b) that the Company tightened its labor budget by eliminating food safety training hours for employees, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

c) that the Company's restaurants were widely failing food safety audits that evaluated the restaurants effective implementation of food safety protocols, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

d) that the Company had experienced foodborne illness outbreaks in Maryland and Michigan;

e) that Chipotle had not taken sufficient remediation steps to prevent further outbreaks from occurring; and

f) that, if and when these outbreaks and/or additional outbreaks became publicized, they were reasonable expected to have an increased damaging effect on the Company's operations and financial performance;

g) that the Company's employees regularly "pencil whipped" temperatures that were higher or lower than required by relevant food safety standards;

h) that the Company's employees were widely failing their certifications; and

i) that the Company had a poor food safety culture

162. Also on October 25, 2016, Chipotle held an earnings call to discuss the Company's third quarter results. During that call, Crumpacker stated: "During the quarter, we ran three marketing campaigns each with different but complementary objectives. The first was a food safety advancements campaign Monty referred to, which was designed to communicate what we've done to ensure the safety of our food. The campaign was broad reaching, with more than 90 million impressions. Lapsed customers engaged more than any others with the video component of the campaign. Results of the campaign are positive and ***we will continue to communicate the benefits of our food safety program so that every customer can rest assured that our food is as safe as possible***."

163. The foregoing representations in ¶ 162 were materially false and/or misleading because Chipotle's food was not "as safe as possible" and because Defendants failed to disclose:

a) that the Company's restaurants were chronically and severely understaffed, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

b) that the Company tightened its labor budget by eliminating food safety training hours for employees, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

c) that the Company's restaurants were widely failing food safety audits that evaluated the restaurants effective implementation of food safety protocols, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

d) that the Company had experienced foodborne illness outbreaks in Maryland and Michigan;

e) that Chipotle had not taken sufficient remediation steps to prevent further outbreaks from occurring;

f) that, if and when these outbreaks and/or additional outbreaks became publicized, they were reasonable expected to have an increased damaging effect on the Company's operations and financial performance;

g) that the Company's employees regularly "pencil whipped" temperatures that were higher or lower than required by relevant food safety standards;

h) that the Company's employees were widely failing their certifications; and

i) that the Company had a poor food safety culture

164. On February 2, 2017, during an earnings call discussing the Company's financial and operating results for the quarter and fiscal year ending December 31, 2016, Ells stated "I'm also confident in the significant changes we've made throughout the last year to position Chipotle for a strong performance in 2017. These efforts include ***the implementation of an industry-leading food safety system*** …."

165. The foregoing representations in ¶ 164 were materially false and/or misleading because the Company had not successfully implemented its food safety protocols in its restaurants, and because Defendants failed to disclose:

a) that the Company's restaurants were chronically and severely understaffed, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

b) that the Company tightened its labor budget by eliminating food safety training hours for employees, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

c) that the Company's restaurants were widely failing food safety audits that evaluated the restaurants effective implementation of food safety protocols, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

d) that the Company had experienced foodborne illness outbreaks in Maryland, Michigan, Florida and Minnesota;

e) that Chipotle had not taken sufficient remediation steps to prevent further outbreaks from occurring; and

f) that, if and when these outbreaks and/or additional outbreaks became publicized, they were reasonable expected to have an increased damaging effect on the Company's operations and financial performance;

g) that the Company's employees regularly "pencil whipped" temperatures that were higher or lower than required by relevant food safety standards;

h) that the Company's employees were widely failing their certifications; and

i) that the Company had a poor food safety culture

166. On February 7, 2017, Chipotle filed an annual report on Form 10-K with the SEC, signed by Ells, Hartung, Charlesworth and other members of the Board of Directors, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 10-K"). For the quarter, Chipotle reported net income of $15.98 million, or $0.55 per diluted share, on revenue of $1.03 billion, compared to net income of $67.87 million, or $2.17 per diluted share, on revenue of $997.51 million for the same period in the prior year. For fiscal year 2016, Chipotle reported net income of $22.94 million, or $0.77 per diluted share, on revenue of $3.90 billion, compared to net income of $475.60 million, or $15.10 per diluted share, on revenue of $4.5 billion for fiscal year 2015.

167. In the 2016 10-K, the Company stated, in relevant part:

> Our training, operations, and risk management departments develop and ***implement*** operating standards for ***food quality, preparation, cleanliness, employee health protocols, and safety in the restaurants***. Our food safety programs are also designed to ensure that we not only continue ***to comply with applicable federal, state and local food safety regulations, but establish Chipotle as an industry leader in food safety.***
>
> While our food safety programs have always been carefully designed and ***have been in conformance with applicable industry standards***, over the last year our Executive Director of Food Safety, a respected expert in the industry, has led a comprehensive assessment and enhancement of our food safety programs and practices. Components of our enhanced food safety programs include: …
>
> - ***enhanced restaurant procedures (protocols for handling ingredients and sanitizing surfaces in our restaurants***);
> - ***food safety certification***;
> - ***internal and third party restaurant inspections***; and
>
> ***
>
> As a result of the food safety incidents described elsewhere in this report, we have ***implemented a number of enhancements to our food safety protocols to ensure that our food is as safe as it can be***. Many of our enhanced procedures, which go beyond the industry-standard food safety practices that we were previously

> following, ***increase the cost of some ingredients or the amount of labor required to prepare and serve our food***.
>
> ***
>
> Although we have followed industry standard food safety protocols in the past, and ***over the past year have enhanced our food safety procedures to ensure that our food is as safe as it can possibly be, we may still be at a higher risk for food-borne illness occurrences than some competitors due to our greater use of fresh, unprocessed produce and meats, our reliance on employees cooking with traditional methods rather than automation, and our avoiding frozen ingredients***. … Furthermore, ***we have seen instances of unsubstantiated reports linking illnesses to Chipotle***, and these reports have negatively impacted us.
>
> ***
>
> [A]s part of our response to the food-borne illness incidents, ***we have implemented enhanced food safety procedures in our supply chain and restaurants***…

168. The foregoing representations in ¶ 167 were materially false and/or misleading because the Company had not successfully implemented its food safety protocols in its restaurants, the Company was not in compliance with applicable federal, state and local food safety regulations, the Company's food safety programs were not in "conformance with applicable industry standards, and because Defendants failed to disclose:

a) that the Company's restaurants were chronically and severely understaffed, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

b) that the Company tightened its labor budget by eliminating food safety training hours for employees, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

c) that the Company's restaurants were widely failing food safety audits that evaluated the restaurants effective implementation of food safety protocols, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

d) that the Company had experienced at least five foodborne illness outbreaks in Maryland, Michigan, Florida and Minnesota;

e) that Chipotle had not taken sufficient remediation steps to prevent further outbreaks from occurring; and

f) that, if and when these outbreaks and/or additional outbreaks became publicized, they were reasonable expected to have an increased damaging effect on the Company's operations and financial performance;

g) that the Company's employees regularly "pencil whipped" temperatures that were higher or lower than required by relevant food safety standards;

h) that the Company's employees were widely failing their certifications;

i) that the Company had a poor food safety culture

169. On March 30, 2017, Chipotle filed a proxy statement on Schedule 14A, stating, in part, "We Conducted a top-to-bottom review of our food safety programs and procedures and made enhancements to ensure that our food is as safe as it can possibly be."

170. The foregoing representations in ¶ 169 were materially false and/or misleading because the Company had not successfully implemented its food safety protocols in its restaurants and its food was not "as safe as it can possibly be" and because Defendants failed to disclose:

a) that the Company's restaurants were chronically and severely understaffed, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

b) that the Company tightened its labor budget by eliminating food safety training hours for employees, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

c) that the Company's restaurants were widely failing food safety audits that evaluated the restaurants effective implementation of food safety protocols, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

d) that the Company had experienced at least five foodborne illness outbreaks in Maryland, Michigan, Florida and Minnesota;

e) that Chipotle had not taken sufficient remediation steps to prevent further outbreaks from occurring; and

f) that, if and when these outbreaks and/or additional outbreaks became publicized, they were reasonable expected to have an increased damaging effect on the Company's operations and financial performance;

g) that the Company's employees regularly "pencil whipped" temperatures that were higher or lower than required by relevant food safety standards;

h) that the Company's employees were widely failing their certifications; and

i) that the Company had a poor food safety culture

171. The statements referenced in ¶¶ 35-48 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Chipotle's purported improvements in its restaurants' food safety policies were inadequate; (ii) accordingly, Chipotle's quality controls were still not in compliance with applicable consumer and workplace safety regulations; (iii) in turn, Chipotle's quality controls remained inadequate to safeguard consumer and employee health; and (iv) as a result of the foregoing, Chipotle's public statements were materially false and misleading at all relevant times.

**<u>The Truth Begins To Emerge</u>**

172. On July 18, 2017, media outlets reported that Chipotle had closed a restaurant in Sterling, Virginia due to a suspected norovirus outbreak. According to *Business Insider*, citing information from iwaspoisoned.com, a website on which consumers document suspected incidents of foodborne illness, at least 13 customers fell ill after eating at the Chipotle restaurant in question between July 14 and July 15. The *Business Insider* article further stated that customers who fell sick after eating at the restaurant reported "vomiting violently," fevers, "violent stomach cramps," and dizziness for several days.

173. On this news, Chipotle's share price fell $17.02, or 4.34%, to close at $374.98 on July 18, 2017.

174. On July 20, 2017, *The Wall Street Journal* published an article entitled "Over 100 Report Being Sickened at Virginia Chipotle," disclosing that the number of reports of illness associated with the restaurant-chain continue to rise. The article stated, in relevant part:

> Chipotle Mexican Grill Inc. reopened the location it temporarily closed this week in Sterling, Va. after learning of a small number of customers who complained of getting sick after eating there.
>
> ***But its latest food safety incident may be worse than expected, as the number of reports of illness associated with that store last week continue to rise.***
>
> Chipotle closed the Sterling location on Monday for a "thorough sanitization" after learning of anonymous complaints posted on iwaspoisoned.com, saying it suspected the culprit was norovirus, a common virus that can be spread through food that has been handled by people who are sick. The location reopened on Wednesday.
>
> ***As of late Wednesday night, Patrick Quade, the founder of the food poisoning website, said the site had received reports of 133 people sickened at the Sterling Chipotle.***
>
> "We know that maintaining the highest level of safety in all of our restaurants is incumbent upon us. I made a commitment on behalf of Chipotle to make our restaurants the safest place to eat, and I am confident in the programs and procedures we have implemented," Chipotle founder and Chief Executive Steve Ells said in a statement, referring to the many changes Chipotle has made to its food-safety system in the last two years.
>
> On Tuesday, Jim Marsden, Chipotle's executive director of food safety, said: "Norovirus does not come from our food supply, and it is safe to eat at Chipotle."
>
> Chipotle is working with the local health department, which is investigating the cause.
>
> (Emphasis added.)

175. On that same day, *Reuters* published an article entitled "Chipotle Virginia customer tested positive for norovirus – official," reporting that a county health department official has confirmed norovirus in a customer who ate at the Virginia Chipotle Mexican Grill Inc. restaurant.

176. Later in the day, *CNBC* published an article entitled "Rodents reportedly fall from ceiling of Dallas Chipotle," reporting that rodents were spotted at a Dallas-area Chipotle on July 19, 2017. According to the article, diners captured the incident inside the restaurant on video, which shows "rodents crawling around the floor and one climbing up the wall," and with customers claiming the rodents were falling from the ceiling.

177. On these disclosures, Chipotle's share price fell $16.78, or 4.5%, to close at $356.05 on July 20, 2017.

178. During a July 25, 2017 earnings call, Ells admitted that the Virginia outbreak was not the result of meat or produce provided by a third-party but rather Chipotle employees' failure to follow food safety practices: "Norovirus is a common and highly contagious illness affecting nearly 20 million Americans each year and is ***unrelated to our food supply chain***. … ***It was a failure in one restaurant to comply with our procedures to prevent norovirus***." Ells continued, "We conducted a thorough investigation, and it revealed that our leadership there didn't strictly adhere to our company protocols. And we believe someone was working while sick."

179. On July 26, 2017, the Company announced that on July 19, 2017 it had received a follow-up subpoena to the subpoena received in January 2016 requesting information related to illness incidents associated with a single Chipotle restaurant in Sterling, Virginia.

180. On October 24, 2017, Chipotle issued a press release announcing the Company's financial and operating results for the quarter ending September 30, 2017. Of note, the Company's comparable restaurant sales increased only 1.0% from Q3 2015. This was particularly problematic given the Q3 2016 sales were poor as a result of the 2015 foodborne illness outbreaks. As one analyst observed, "The comp sales highlighted the big problem.

Chipotle saw comp sales plunge 21.9% from the health scare last year so the meager 1.0% gain was horrendous."

181. As a result of this disclosure, Chipotle's share price plummeted $47.29, or 14%, from $324.30 on October 24, 2017 to $277.01 on October 25, 2017.

182. Analysts recognized that the poor results were because of the norovirus outbreak in Virginia. For example, an analyst report by Jefferies reduced the Price Target from $350 to $300 on "depressed results" and identified the "Key Takeaway" as "3Q results weaker than lowered Street est[imate]s given challenges from norovirus incident in VA…"

183. On November 29, 2017, Ells resigned as CEO of Chipotle.

184. The market recognized that the resignation was a result of the ongoing foodborne illnesses outbreaks, specifically, the recent Virginia outbreak, and the resulting decline in sales. For example, headlines following Ells resignation included: "Chipotle founder finally resigns on the heels of more food-safety troubles" and "Chipotle CEO steps down after health scares and falling sales".

**Omissions Based On Violations Of Items 303 and 503**

185. During the Class Period, Chipotle filed the 2015 Form 10-K, the 1Q 2016 Form 10-Q, the 2Q 2016 Form 10-Q, 3Q 2016 Form 10-Q, 2016 Form 10-K, 2Q 2017 Form 10-Q and 2Q 2017 Form 10-Q with the SEC. Each of these documents was signed by defendant Hartung. The 201510-K was signed by Ells, Moran, Hartung and Charlseworth, and 2016 10-K was signed by Ells, Hartung and Charlseworth. Each of these documents was certified pursuant to SOX by the Individual Defendants. As detailed herein, these filings failed to disclose material information required to be disclosed pursuant to controlling SEC rules and regulations.

**Item 303**

186. The SEC created specific rules governing the content of disclosures made by public companies in their filings with the SEC. SEC Regulation S-K requires that every Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

187. Specifically, Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (i.e., Forms 10-Q and 10-K), among other things:

> (i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.
>
> (ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

188. Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

189. The following were known trends, events, or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations and,

therefore, were required to be disclosed by Defendants pursuant to Item 303 in the 2015 Form 10-K, 1Q 2016 Form 10-Q, 2Q 2016 Form 10-Q, 3Q 2016 Form 10-Q, 2016 Form 10-K, 1Q 2017 Form 10-Q and 2Q 2017 Form 10-Q:

a) that the Company's restaurants were chronically and severely understaffed, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

b) that the Company tightened its labor budget by eliminating food safety training hours for employees, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

c) that the Company's restaurants were widely failing food safety audits that evaluated the restaurants effective implementation of food safety protocols, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

d) that the Company had experienced five foodborne illness outbreaks in Maryland, Minnesota, Michigan and Florida;

e) that Chipotle had not taken sufficient remediation steps to prevent further outbreaks from occurring; and

f) that, if and when these outbreaks and additional outbreaks became publicized, they were reasonable expected to have an increased damaging effect on the Company's operations and financial performance.

190. The foregoing concealed facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;" (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations;" and (iii) "unusual or infrequent events or transactions or []significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

**Item 503**

191. Pursuant to Item 1A of Form 10-K, Chipotle's 2015 Form 10-K and 2016 Form 10-K were required to furnish the information pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.503], including, among other things, a "discussion of the most significant factors that make the [securities] speculative or risky." Pursuant to Item 1A of Form 10-Q, Chipotle's Class Period Forms 10-Q were required to "[s]et forth any material changes from risk factors as previously disclosed" in Chipotle's previously filed Form 10-K pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.503].

192. Defendants failed to comply with Item 503 by failing to adequately disclose risk factors or material changes in risk factors in these SEC filings.

193. Specifically, Defendants failed to disclose the following in Chipotle's 2015 Form 10-K, the 1Q 2016 Form 10-Q, the 2Q 2016 Form 10-Q, 3Q 2016 Form 10-Q, 2016 Form 10-K, 2Q 2017 Form 10-Q and 2Q 2017 Form 10-Q, as required under Item 503

a) that the Company's restaurants were chronically and severely understaffed, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

b) that the Company tightened its labor budget by eliminating food safety training hours for employees, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

c) that the Company's restaurants were widely failing food safety audits that evaluated the restaurants effective implementation of food safety protocols, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

d) that the Company had experienced five foodborne illness outbreaks in Maryland, Minnesota, Michigan and Florida;

e) that Chipotle had not taken sufficient remediation steps to prevent further outbreaks from occurring; and

f) that, if and when these outbreaks and additional outbreaks became publicized, they were reasonable expected to have an increased damaging effect on the Company's operations and financial performance.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

194. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Chipotle securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

195. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Chipotle securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Chipotle or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

196. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

197. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

198. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Chipotle;
- whether the Individual Defendants caused Chipotle to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Chipotle securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

199. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

200. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Chipotle securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Chipotle securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

201. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

202. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

203. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

204. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

205. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Chipotle securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Chipotle securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

206. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Chipotle securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Chipotle's internal quality controls, finances, and business prospects.

207. By virtue of their positions at Chipotle, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

208. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Chipotle, the Individual Defendants had knowledge of the details of Chipotle's internal affairs.

209. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Chipotle. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Chipotle's quality controls, businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Chipotle securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Chipotle's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class

purchased or otherwise acquired Chipotle securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

210. During the Class Period, Chipotle securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Chipotle securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Chipotle securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Chipotle securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

211. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

212. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

213. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

214. During the Class Period, the Individual Defendants participated in the operation and management of Chipotle, and conducted and participated, directly and indirectly, in the conduct of Chipotle's business affairs. Because of their senior positions, they knew the adverse non-public information about Chipotle's misstatement of income and expenses and false financial statements.

215. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Chipotle's financial condition and results of operations, and to correct promptly any public statements issued by Chipotle which had become materially false or misleading.

216. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Chipotle disseminated in the marketplace during the Class Period concerning Chipotle's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Chipotle to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Chipotle within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Chipotle securities.

217. Each of the Individual Defendants, therefore, acted as a controlling person of Chipotle. By reason of their senior management positions and/or being directors of Chipotle, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Chipotle to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Chipotle and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

218. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Chipotle.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury.

Dated: December 12, 2017

Respectfully submitted,

*<u>Michael J. Wernke</u>*

**POMERANTZ LLP**
Jeremy A. Lieberman
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
mjwernke@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

***Lead Counsel for Plaintiffs***