IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No. 17-cv-01760-WYD-STV

ROBERT NARDY, JR. and ELIZABETH KELLEY, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

CHIPOTLE MEXICAN GRILL, INC.,
M. STEVEN ELLS,
MONTGOMERY F. MORAN
JOHN R. HARTUNG,
TIMOTHY SPONG,
MARK CRUMPACKER, and
JOHN S. CHARLESWORTH

Defendants.

---

## ORDER ON MOTION TO DISMISS

---

### I. INTRODUCTION

Lead Plaintiffs Robert Nardy, Jr. and Elizabeth Kelley ("Plaintiffs"), individually and on behalf of all other similarly situated shareholders, bring this securities class action against Defendants, Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company"), and several Chipotle executives. Plaintiffs bring this case on behalf of a class who purchased or acquired Chipotle securities between February 5, 2016 and October 24, 2017 ("Class Period"). Plaintiffs' securities fraud claims rest on §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Act"), codified as 15 U.S.C. §§ 78j(b)and 78t(a), respectively, and

Rule 10b-5 promulgated thereunder, codified as 17 C.F.R. § 240.10b-5.[1] Plaintiffs also claim Defendants violated Item 303 of Regulation S-K, 17 C.F.R. § 229.303(3)(a) ("Item 303") and Item 503 of Regulation S-K, 17 C.F.R. § 229.503(c) ("Item 503") by not making certain disclosures.

Plaintiffs generally allege that in the wake of several foodborne illness outbreaks at Chipotle restaurants in several states across the country between August 2015 and January 2016, Chipotle falsely represented that it was in compliance with food safety regulations and that it had implemented and trained its employees on food safety practices. (ECF No. 35, First Amended Complaint ("Complaint"), ¶¶ 3-16). Plaintiffs also claim that Chipotle failed to make certain disclosures during the Class Period. (*Id.*).

Defendants move to dismiss the Complaint. Plaintiffs oppose the motion, but request leave to file a second amended complaint in the event their Complaint is dismissed. For the reasons explained below, Defendants' motion is granted and Plaintiffs' request to file a second amended complaint is denied.

## II. <u>BACKGROUND</u>

### A. The Parties

Plaintiffs acquired Chipotle securities during the Class Period. (Complaint, ¶ 21).

Defendant M. Steven Ells founded Chipotle in 1993 as a fast-food restaurant. (*Id.* at ¶¶ 22-23). Chipotle is a publicly traded company, and operated more than 1,900 restaurants in the United States as of December 2015. (*Id.* at ¶ 22). Ells and Defendant Montgomery F. Moran served as Chipotle's Co-CEOs from 2009 until December 2016.

[1] The scope of Rule 10b-5 is coextensive with § 10(b), and I therefore use Rule 10b-5 to refer to the statute and the rule. *S.E.C. v. Curshen*, 372 Fed. App'x 872, 877 n.1 (10th Cir. 2010).

(*Id.* at ¶¶ 23-24). During the Class Period, Ells also served as Chairman of Chipotle's board of directors. (*Id.* at ¶ 23). Moran resigned as CEO in December 2016, allegedly "in light of the significant fallout from the foodborne illness outbreaks" and "at the Board's request." (*Id.* at ¶ 24). After Moran's resignation, Ells was Chipotle's only CEO until November 29, 2017 when he resigned. (*Id.* at ¶¶ 23-24, 183). Prior to becoming Co-CEO, Moran served as Chipotle's outside general counsel for many years. (*Id.* at ¶ 24).

Defendant John R. Hartung is, and served throughout the Class Period as, Chipotle's Chief Financial Officer and Principal Accounting Officer. (*Id.* at ¶ 25). In these capacities, Hartung was responsible for Chipotle's financial and reporting functions and overseeing information technology, safety security and risk ("SSR"), and compensation and benefits. (*Id.*).

Defendant Timothy Spong is, and served throughout the Class Period as, Chipotle's Executive Director of Supply Chain and SSR. (*Id.* at ¶ 26). Spong allegedly "received all information, reports, and audits concerning Chipotle's food safety protocols and compliance" and "was able to and did, directly or indirectly, control the content of the statements of Chipotle concerning food safety issues and he was consulted as to and participated in the drafting of those statements." (*Id.*).

Defendant Mark Crumpacker started serving as Chipotle's Chief Development Officer in 2017. (*Id.* at ¶ 27). In this role, "he oversaw the company's real estate, design, construction, and facilities functions worldwide." (*Id.*). He also served as Chipotle's Chief Marketing Officer and Chief Development Officer. (*Id.*).

Finally, Defendant John S. Charlesworth served on Chipotle's Board of Directors from 1999 until 2017 and was a member of the Audit Committee during the Class Period.

(*Id.* at ¶ 28). After the 2015 foodborne illness outbreaks, Charlesworth was designated "as the principal liaison to the Audit Committee in connection with its enhanced food safety oversight role." (*Id.*).

Plaintiffs allege that as "directors, officers and executives of Chipotle, the Individual Defendants are candidates for imputing corporate scienter to Chipotle." (*Id.* at ¶ 30).

**B. Confidential Witnesses**

Plaintiffs' Complaint includes the allegations of nine confidential witnesses. Each confidential witness worked at Chipotle for some period during the Class Period. (Complaint, ¶¶ 33-41). One confidential witness worked as a Crew Member and another worked as a Kitchen Manager. (*Id.* at ¶¶ 33, 35). Part of their responsibilities were to prepare and cook food, and train new employees. (*Id.*). Five confidential witnesses worked as Area Managers and supervised Chipotle restaurants. (*Id.* at ¶¶ 34, 36-37, 39, 41). One witness worked as a General Manager, and the final witness worked as a Team Director where he or she managed Area Managers. (*Id.* at ¶¶ 38, 40).

**C. 2015 Foodborne Illness Outbreaks**

Between August 2015 and December 2015, several hundred customers and employees of Chipotle restaurants in California, Massachusetts, Minnesota, Oregon, and Washington reported becoming ill after eating or working at the restaurants. (Complaint, ¶¶ 42-46). In California and Massachusetts, local environmental health division investigated the reports and determined those illnesses were related to a norovirus outbreak. (*Id.* at ¶¶ 43, 46). Norovirus is a type of virus that "infects humans through person-to-person transmission or through contamination of food or water." (*Id.* at ¶ 43 n.2).

Salmonella caused the outbreak in Minnesota. (*Id.* at ¶ 44). Salmonella is a type of bacteria that is transmitted to humans when they eat food already contaminated by Salmonella. (*Id.* at ¶ 44 n.3). Salmonella contaminates food when the food contacts raw or inadequately prepared or cleaned meat, and when food handlers do not wash their hands with soap after using the bathroom. (*Id.*). E. Coli bacteria caused the illnesses in Oregon and Washington. (*Id.* at ¶ 45). E. Coli often contaminates food in the same way that Salmonella does. (*Id.* at ¶ 45 n.4).

Plaintiffs allege that these foodborne illness outbreaks "were linked to the Company's restaurants and poor food safety practices" and caused Chipotle's sales and stock price to plummet. (*Id.* at ¶ 42).

**D. Chipotle's Public Response to the Outbreaks**

In several public comments, Chipotle recognized "that food safety practices and the prevention of foodborne illness outbreaks were of the utmost importance to investors as the Company's sales and profitability continued to suffer throughout 2016 and 2017 as a result of the 2015 outbreaks." (Complaint, ¶¶ 50). To restore public confidence in the safety of its food, Chipotle "publicized measures that the Company touted as improvements to its food safety protocols." (*Id.* at ¶¶ 54, 56-57). For example, Chipotle closed all of its restaurants for several hours on February 8, 2016 "for an all-staff meeting regarding food safety." (*Id.* ¶ 54). Chipotle also implemented several food-handling policy changes in its restaurants, which included "requiring all employees to wash their hands every half hour, mandating that two employees verified that certain ingredients had been immersed in hot water for at least five seconds to kill germs, and using Pascalization to pre-treat food ingredients." (*Id.*).

### E. Chipotle's Implementation of New Food Safety Protocols

Plaintiffs allege Chipotle failed to provide its restaurants with the resources necessary to implement the newly announced food safety standards. (*See* Complaint, ¶¶ 58-95). Plaintiffs allege Chipotle "did not create or support a system that ensured its restaurants were adequately staffed so employees would have enough time to properly learn and execute the safety protocols." (*Id.* at ¶ 63). Because the restaurants were chronically understaffed, employees were prevented "from receiving the required food safety training and from employing proper food safety techniques." (*Id.* at ¶ 68). In addition, overburdened employees "do not have as much time to ensure that the food safety protocols are being followed fully" and may take "short cuts on the food safety protocols" during rush hours. (*Id.* at ¶¶ 72, 74). One of these short cuts involved "pencil whipping" temperatures. (*Id.* at ¶ 96). Pencil whipping was a euphemism for the practice of falsifying food holding temperatures. (*Id.* at ¶¶ 96-102).

Chipotle restaurant managers were also not allowed additional hours to train their employees on food safety which allegedly undermined Chipotle's efforts to implement the new protocols. (*Id.* at ¶¶ 60, 81, 86). When a restaurant hired a new employee, the restaurant manager was not allocated additional training hours to train the employee in excess of the hours normally used to run the restaurant. (*Id.* at ¶¶ 84, 87-88, 90). Chipotle allegedly did not adequately train employees on food safety, and when Chipotle adopted new food safety protocols, it did not adopt a corresponding new training plan. (*Id.* at ¶¶ 58, 80, 82, 92).

Chipotle Area Managers were required to perform food safety audits once a week after Chipotle announced the new food safety protocols. (*Id.* at ¶ 103). According to

Plaintiffs, these weekly audits were reviewed by Defendants and revealed that many of Chipotle's restaurants were failing the internal audit and not complying with the new protocols. (*Id.* at ¶ 104, 144-47).

### F. 2016 and 2017 Foodborne Illness Outbreaks

Plaintiffs allege that Chipotle's failure to improve its food safety practices led to additional norovirus and Salmonella outbreaks in 2016 and 2017.

#### 1. Maryland Outbreak

Sometime in 2016, a local health department investigated a foodborne outbreak in a Chipotle restaurant in Columbia, Maryland. (Complaint, ¶ 115).

#### 2. Michigan Outbreak

In the middle of 2016, a Michigan county health department concluded a Chipotle restaurant caused a Salmonella outbreak. (Complaint, ¶ 116). The department issued a report which identified at least seven food safety violations. (*Id.* at ¶ 118). The likely source of the Salmonella exposure was a Chipotle restaurant, "with possible contaminated foods including chicken, black beans, guacamole, pico de gallo, lettuce and cheese. The out-of-compliance observations referenced under food safety are indicative of an increased risk for foodborne illness." (*Id.* at ¶ 120).

#### 3. Minnesota Outbreaks

In December 2016, six individuals complained to the Minnesota Department of Health ("MDH") of sickness after eating at a Chipotle restaurant in Rochester, Minnesota. (Complaint, ¶ 121). Some of these individuals tested positive for norovirus. (*Id.* at ¶ 122). MDH also discovered that four Chipotle employees reported recent illness, and at least one of those employees worked without reporting their symptoms to management. (*Id.*

at ¶ 123). MDH concluded that "[a]n ill or recently ill foodworker was likely the source of [the norovirus] illness." (*Id.* at ¶ 124).

In February 2017, MDH investigated three reports of customer illness after eating at a Chipotle restaurant in Rogers, Minnesota. (*Id.* at ¶ 126). MDH determined the sickness was due to norovirus infections. (*Id.* at ¶ 131). MDH interviewed each of the employees of that restaurant and found that ten employees admitted recent gastrointestinal illness. (*Id.* at ¶ 130). MDH again concluded "[a]n ill or recently ill foodworker was the likely source of the illnesses." (*Id.* at ¶ 131).

#### 4. Florida Outbreak

In January 2017, twelve individuals were infected by norovirus due to contaminated corn salsa and lettuce served at a Chipotle restaurant in Wellington, Florida. (Complaint, ¶ 125). The Florida Department of Health determined "the food was contaminated as a result of an infected employee preparing the food with their bare hands." (*Id.*).

### G. 2017 Virginia Foodborne Illness Outbreak and Market Reaction

On July 18, 2017, a media outlet reported that Chipotle closed a restaurant in Sterling, Virginia due to a possible norovirus outbreak. (Complaint, ¶ 172). On July 20, 2017, two other media outlets published articles related to the closing of the restaurant in Sterling. (*Id.* at ¶¶ 174-75). Chipotle's share prices fell approximately four and a half percent after the July 18 report, and another four and a half percent after the July 20 report. (*Id.* at ¶ 173, 177).

On July 25, 2017, Ells admitted in an earnings call that the outbreak was a result of "a failure in one restaurant to comply with our procedures to prevent norovirus." (*Id.* at

¶ 178). Ells continued that after an internal investigation, Chipotle determined that its "leadership [at the restaurant] didn't strictly adhere to our company protocols." (*Id.*).

On October 24, 2017, Chipotle issued a press release announcing the company's financial and operating results for the quarter ending September 30, 2017. (*Id.* at ¶ 180). The comparable restaurant sales increase was lower than expected, which resulted in Chipotle's share price falling fourteen percent. (*Id.* at ¶¶ 180-81). One analyst opined that the third quarter results were "weaker than lower Street est[imate]s given challenges from norovirus incident in VA . . . ." (*Id.* at ¶ 182).

## III. <u>PLAINTIFFS' CLAIMS</u>

Plaintiffs claim that Defendants made materially false or misleading statements and omitted material information in violation of Rule 10b-5 and Section 20(a) during the Class Period.

### A. The Alleged Material Misrepresentations or Omissions

Plaintiffs base their claims on alleged misrepresentations or omissions in the following financial statements filed by Chipotle with the Securities and Exchange Commission ("SEC"), press releases, or earnings calls during the Class Period: (1) a 2015 Form 10-K filed with the SEC on February 5, 2016 ("2015 10-K"); (2) a 2016 Form 10-K filed with the SEC on February 7, 2017 ("2016 10-K); (3) an April 26, 2016 press release; (4) an October 25, 2016 press release; (5) an October 25, 2016 comment by Crumpacker during an earnings call; (6) a February 2, 2017 comment by Ells during an earnings call; (7) and a proxy statement on a 2017 Schedule 14A filed with the SEC on March 30, 2017 ("2017 Schedule 14A"). (*See generally* Complaint, ¶¶ 156-170). The alleged

misrepresentations or omissions generally concerned Chipotle's new food safety programs, its implementation of the new programs, and the quality of its workforce.

Plaintiffs claim these disclosures made "materially false and/or misleading" statements related to Chipotle's food safety and staff. Plaintiffs also claim Chipotle failed to disclose:

- that the Company's restaurants were chronically and severely understaffed, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

- that the Company tightened its labor budget by eliminating food safety training hours for employees, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

- that the Company's restaurants were widely failing food safety audits that evaluated the restaurants effective implementation of food safety protocols, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

- that Chipotle had not taken sufficient remediation steps to prevent further outbreaks from occurring;

- that the Company's employees regularly "pencil whipped" temperatures that were higher or lower than required by relevant food safety standards;

- that the Company's employees were widely failing their certifications; and

- that the Company had a poor food safety culture.

(*Id.* at ¶¶ 157, 159, 161, 163, 165, 168, 170).

For statements made on or after October 25, 2016, Plaintiffs claim Chipotle additionally failed to disclose foodborne illness outbreaks in several states and that "if and when these outbreaks and/or additional outbreaks became publicized, they were

reasonabl[y] expected to have an increased damaging effect on the Company's operations and financial performance." (*Id.* at ¶¶ 161, 163, 165, 168, 170).

**B. The Item 303 and Item 503 Omissions**

Plaintiffs also claim Defendants omitted information that was required to be disclosed during the Class Period in the following documents: (1) the 2015 10-K; (2) the 2016 10-K; (3) three quarterly filings submitted in 2016; and (4) two quarterly filings submitted in 2017. (Complaint, ¶ 185). Specifically, Plaintiffs contend Defendants failed to disclose:

- that the Company's restaurants were chronically and severely understaffed, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

- that the Company tightened its labor budget by eliminating food safety training hours for employees, which prevented the effective implementation of food safety protocols in the restaurants, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

- that the Company's restaurants were widely failing food safety audits that evaluated the restaurants effective implementation of food safety protocols, and the risk that foodborne illness outbreaks could occur and reasonably continue to occur had greatly increased;

- that the Company had experienced five foodborne illness outbreaks in Maryland, Minnesota, Michigan and Florida;

- that Chipotle had not taken sufficient remediation steps to prevent further outbreaks from occurring; and

- that, if and when these outbreaks and additional outbreaks became publicized, they were reasonabl[y] expected to have an increased damaging effect on the Company's operations and financial performance.

(*Id.* at ¶¶ 189, 193).

Plaintiffs complain this information was required to be disclosed pursuant to Item 303 because the information qualified as “known trends, events, or uncertainties that were having, and were reasonably likely to have, an impact on the Company’s continuing operations.” (*Id.* at ¶ 189). Plaintiffs also argue that by not including this information, Defendants violated Item 503 “by failing to adequately disclose risk factors or material changes in risk factors in these SEC filings.” (*Id.* at ¶ 192).

## IV. STANDARD OF REVIEW

### A. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

“The court’s function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff’s complaint alone is legally sufficient to state a claim for which relief may be granted.” *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1201 (10th Cir. 2003). The general pleading standard under Federal Rule of Civil Procedure 8 is that the plaintiff must plead “enough facts to state a claim to relief that is plausible on its face.” *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 569 (2007). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow “the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. Heightened Pleading Standard

Plaintiffs alleging securities fraud and related causes of action must meet the heightened pleadings standards of the Private Securities Litigation Reform Act (“PSLRA”) to survive a motion to dismiss. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095-96 (10th Cir. 2003). The PLSRA was enacted “[a]s a check against abusive litigation by private parties,” *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007),

and, consequently, "[a] plaintiff suing under Section 10(b), . . . bears a heavy burden at the pleading stage," *In re Level 3 Commc'n Sec. Litig.* (*Level 3*), 667 F.3d 1331, 1333 (10th Cir. 2012). To achieve its purpose, the PSLRA strengthened what is required to adequately plead two of the elements of a Rule 10b-5 claim: material misrepresentation or omission and scienter. *Adams*, 340 F.3d at 1095.

First, the PLSRA "increased the burden on a plaintiff's pleading of the first element of a securities fraud action." *Id.* The PLSRA requires a plaintiff to allege a material misrepresentation or omission and "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Second, a plaintiff may not generally allege that a defendant acted with scienter, as permitted under Federal Rule of Civil Procedure 9(b). *Level 3*, 667 F.3d at 1333. Instead, the plaintiff must "with respect to each act or omission alleged . . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

In summary, the "PLSRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to 'deceive, manipulate, or defraud.'" *Tellabs, Inc.*, 551 U.S. at 313 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)).

The Supreme Court has established three criteria upon which to determine whether a plaintiff has met this heightened pleading standard: (1) "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept

all factual allegations in the complaint as true"; (2) "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference"; and (3) "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc.*, 551 U.S. at 322-23.

### C. Materials Considered in Ruling on Defendants' Motion to Dismiss

In addition to the allegations in the Complaint, I consider Chipotle's 2015 10-K and 2016 10-K, the February 2016 and October 2016 earnings calls transcripts, and a news article about Chipotle's stock fall. I consider these documents because they are quoted in the Complaint, Defendants attached them to their motion to dismiss, and the parties do not dispute their authenticity. *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) (A court "may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity" without converting a motion to dismiss into a motion for summary judgment.). Finally, I accept as true the well-pleaded allegations of Plaintiffs' confidential witnesses. *See Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1239 (10th Cir. 2016).

## V. APPLICABLE LAW

This section reviews the requirements to state a claim under Rule 10b-5 and Section 20(a), and the disclosure requirements of Items 303 and 503.

### A. Requirements to State a Claim Under Rule 10b-5

"Section 10(b) [of] the Act, 15 U.S.C. § 78j(b), and the SEC's Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, prohibit fraudulent acts done in

connection with securities transactions." *Adams*, 340 F.3d at 1094-95. Section 10(b) prohibits "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). The text and purpose of Section 10(b) imply a private cause of action. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).

The SEC prescribed Rule 10b-5 to implement Section 10(b). *Id.* Rule 10b-5, makes it unlawful, "in connection with the purchase or sale of any security," to

> employ any device, scheme, or artifice to defraud, . . . make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or . . . engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5(a)-(c).

To state a claim for securities fraud under Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). My analysis of these elements is limited to the first, second, and sixth elements because those are the only elements challenged by Defendants.

**1. Material Misrepresentation or Omission**

To establish a material misrepresentation or omission, a plaintiff must allege the defendant "(A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading." 15 U.S.C. § 78u-4(b)(1)(A)-

(B); *see also* 17 C.F.R. § 240-10b-5(b). Under the heightened pleading standards of the PSLRA, a plaintiff must "specify each statement alleged to have been misleading" and explain "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

With respect to omissions, "the plaintiff must show that the defendant had a duty to disclose the omitted information." *Employees' Ret. Sys. of Rhode Island v. Williams Companies, Inc.*, 889 F.3d 1153, 1162 (10th Cir. 2018). A duty to disclose may arise when a statement is material and "the omitted fact is material to the statement in that it alters the meaning of the statement." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (internal quotation marks omitted); *see also Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (noting a duty to disclose may arise when a corporate statement would otherwise be inaccurate, incomplete, or misleading). To be actionable, an omission must render misleading the affirmative statements actually made. *Jensen v. Kimble*, 1 F.3d 1073, 1078 (10th Cir. 1993).

"A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997). An alleged omission is material where there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Matrixx Initiatives, Inc.,* 563 U.S. at 38 (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32 (1988)). "[V]ague statements of corporate optimism" and "mere puffing" are immaterial as a matter of law because "reasonable investors do not rely on them in making investment decisions." *Grossman*, 120 F.3d at 1119 (quotation marks omitted).

This is true unless "the opinion is known by the speaker at the time it is expressed to be untrue or to have no reasonable basis in fact." *Id.* at 1119 n.6.

### 2. Scienter

To adequately plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter means an "intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193. Scienter may also be satisfied by a showing of recklessness, although recklessness "in the context of securities fraud is a high bar." *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1201 (10th Cir. 2015). Recklessness means "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001). The conduct must be "something akin to conscious disregard," and even gross negligence is not sufficient to meet this "particularly high standard." *Level 3*, 667 F.3d at 1343 n.12 (internal quotation marks omitted).

The "strong inference" inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 551 U.S. at 322-23. To qualify as a strong inference, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. Moreover,

> [t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared

> to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.

*Id.* at 324.

**3. Loss Causation**

"To plead loss causation, a plaintiff must allege facts showing a causal connection between the revelation of truth to the marketplace and losses sustained by the plaintiff." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1154 (10th Cir. 2015); *see also* 15 U.S.C. § 78u-4(b)(4) ("[T]he plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (loss causation is "a causal connection between the material misrepresentation and the loss"). Loss causation may be established "when a corrective disclosure reveals the fraud to the public and the price subsequently drops," *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009), or "the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized," *Nakkhumpun*, 782 F.3d at 1154.

Under a corrective disclosure theory, a plaintiff must "show both that the corrective information was revealed and that this revelation caused the resulting decline in price." *In re Williams Sec.*, 558 F.3d at 1140. "To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *Id.* The plaintiff must show that his or her "losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price. Without

showing a causal connection that specifically links losses to misrepresentations, he cannot succeed." *Id.* at 1137. Under a materialization of a concealed risk theory, a plaintiff must allege "(1) [t]he risk that materialized was within the zone of risk concealed by the misrepresentation (foreseeability)" and "(2) [t]he materialization of the risk caused a negative impact on the value of the securities (causal link)." *Nakkhumpun*, 782 F.3d at 1154 (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).

**B. Requirements of Item 303 and Item 503**

Item 303 "imposes disclosure requirements on companies filing SEC-mandated reports." *Stratte-McClure*, 776 F.3d at 101. Those requirements include the obligation to "[d]escribe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income" and to "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(3)(a)(i)-(ii).

Item 503 requires an issuer to include in its disclosures "a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c). Item 503 violations generally track Rule 10-b5 violations and the Item 503 inquiry boils down to "whether the Offering Documents were accurate and sufficiently candid." *City of Roseville Empls'. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) (internal quotation marks omitted).

The parties dispute whether a violation of Item 303 or Item 503 can serve to state a Rule 10b-5 securities fraud claim. (*Compare* ECF No. 40 at 16-17 *with* ECF No. 44 at 29-30). The Tenth Circuit has not addressed this issue, and other Circuits have taken

different views as to what is required to state a Rule 10b-5 claim based on Item 303 omissions. *Compare In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054-56 (9th Cir. 2014) *and Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000) *with Stratte-McClure*, 776 F.3d at 102-04. Some courts have held violations of Item 503 are actionable. *City of Roseville*, 814 F. Supp. 2d at 426-427.

I conclude violations of Item 303 and Item 503 do not create an independent duty to disclose that may give rise to liability under Rule 10b-5. *See In re NVIDIA Corp., Sec. Litig.*, 768 F.3d at 1056; *Oran*, 226 F.3d at 287-88; *Markman v. Whole Foods Market, Inc.*, 2016 WL 10567194, at *10 (W.D. Tex. Aug. 19, 2016); *Ash v. PowerSecure Intern., Inc.*, 2015 WL 5444741, at *11 (E.D.N.C. Sept. 15, 2015) ("Item 303 is not a magic black box in which inadequate allegations under Rule 10b-5 are transformed, by means of broader and different SEC regulations, into adequate allegations under Rule 10b-5."). Instead, such violations are "probative of what a company is otherwise obliged to disclose." *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 909 (N.D. Ill. 2001); *see also Brasher v. Broadwind Energy, Inc.*, 2012 WL 1357699, at *13 (N.D. Ill. Apr. 19, 2012); *Kafenbaum v. GTECH Holdings Corp.*, 217 F. Supp. 2d 238, 250 (D.R.I. 2002) ("An Item 303 violation is but one of many pieces of evidence the triers of fact must weigh to determine whether defendants failed to disclose material information in violation of Rule 10b–5.").

**C. Requirements to State a Claim Under Section 20(a)**

Section 20(a) of the Act states every "person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C.A.

§ 78t(a). To state a prima facie claim under Section 20(a), the plaintiff must first establish a violation of the underlying securities law. *Adams*, 340 F.3d at 1107. So "a Section 20(a) claim will stand or fall based on the court's decision regarding the Section 10(b) claim," and "if a court dismisses a complaint's Section 10(b) claim, then the Section 20(a) claim should be dismissed as well." *Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 552-53 (M.D.N.C. 2013).

## VI. ANALYSIS OF CLAIMS FOR ALLEGED MISREPRESENTATIONS IN VIOLATION OF RULE 10b-5

I analyze the materials containing the alleged misrepresentations in the following order: (1) the 2015 10-K; (2) the 2016 10-K; (3) the April 26, 2016 press release; (4) the October 25, 2016 press release; (5) the October 25, 2016 comment by Crumpacker during an earnings call; (6) the February 2, 2017 comment by Ells during an earnings call; and (7) the 2017 Schedule 14A.

### A. 2015 10-K and 2016 10-K

I combine my analysis of the 2015 10-K and the 2016 10-K because the analysis is the same. Chipotle's 2015 10-K stated

> ***Our training, operations, and risk management departments develop and implement operating standards for food quality, preparation, cleanliness, and safety in the restaurants***. . . .
>
> While ***our food safety programs have always been carefully designed and have been in conformance with applicable industry standards***, in response to food safety incidents during 2015 that impacted hundreds of customers we have recently undertaken a comprehensive assessment of our food safety programs and practices. . . . ***Components of the new program include*** DNA-based testing of many ingredients designed to ensure the quality and safety of ingredients before they are shipped to our restaurants, changes to food preparation and food handling practices, including washing and cutting some produce items (such as tomatoes and romaine lettuce) in central kitchens, blanching of some produce items (including avocados, onions, jalapenos and citrus) in our

restaurants before cutting them, and new protocols for marinating meats. . . . Additionally, we are focused on ***internal training programs to ensure that all employees thoroughly understand our high standards for food safety and food handling***. . . .

> As a result of the food safety incidents associated with our restaurants during 2015, ***we have implemented a number of enhancements to our food safety protocols***, and intend to make additional enhancements, to ensure that our food is as safe as it can be.

(Complaint, ¶ 156 (emphasis in Complaint)). The Complaint alleges this statement was false and/or misleading because Defendants had not yet successfully implemented the new food safety protocols or properly trained its employees "to ensure that all employees thoroughly understand our high standards for food safety and food handling." (*Id.* at ¶ 157).

Chipotle's 2016 10-K stated

> Our training, operations, and risk management departments develop and ***implement*** operating standards for ***food quality, preparation, cleanliness, employee health protocols, and safety in the restaurants***. Our food safety programs are also designed to ensure that we not only continue ***to comply with applicable federal, state and local food safety regulations, but establish Chipotle as an industry leader in food safety***.

> While our food safety programs ***have always been carefully designed and have been in conformance with applicable industry standards***, over the last year our Executive Director of Food Safety, a respected expert in the industry, has led a comprehensive assessment and enhancement of our food safety programs and practices. Components of our enhanced food safety programs include: . . .

- ***enhanced restaurant procedures (protocols for handling ingredients and sanitizing surfaces in our restaurants);***
- ***food safety certification;***
- ***internal and third party restaurant inspections; and . . .***

> As a result of the food safety incidents described elsewhere in this report, ***we have implemented a number of enhancements to our food safety protocols to ensure that our food is as safe as it can be***. Many of our enhanced procedures, which go beyond the industry-standard food

> safety practices that we were previously following, ***increase the cost of some ingredients or the amount of labor required to prepare and serve our food***. . . .
>
> Although we have followed industry standard food safety protocols in the past, and ***over the past year have enhanced our food safety procedures to ensure that our food is as safe as it can possibly be, we may still be at a higher risk for foodborne illness occurrences than some competitors due to our greater use of fresh, unprocessed produce and meats, our reliance on employees cooking with traditional methods rather than automation, and our avoiding frozen ingredients***. . . . Furthermore, ***we have seen instances of unsubstantiated reports linking illnesses to Chipotle***, and these reports have negatively impacted us. . . .
>
> [A]s part of our response to the foodborne illness incidents, ***we have implemented enhanced food safety procedures in our supply chain and restaurants***.

(*Id.* at ¶ 167 (emphasis in Complaint)). The Complaint alleges this statement was false and/or misleading because Defendants had not yet successfully implemented the new food safety protocols, Chipotle was not in compliance with applicable safety regulations, and the company's food safety programs did not conform with applicable industry standards. (*Id.* at ¶ 168).

I find that Plaintiffs have failed to adequately allege a material misrepresentation as to (1) the proper training of its employees; (2) the compliance with applicable safety regulations; (3) the Company's conformance with applicable industry standards; and (4) the implementation of the new food safety protocols. The statement in the 2015 10-K about being focused on internal training programs "to ensure that all employees thoroughly understand our high standards for food safety and food handling" was not a misrepresentation because three days after filing the 2015 10-K, Chipotle closed all of its restaurants for several hours to hold a company-wide meeting regarding food safety. (*Id.* ¶¶ 54, 156). The statements in the 2016 10-K regarding Chipotle's compliance with

applicable safety regulations or applicable industry standards are not material misrepresentations because the Complaint does not identify the regulations or standards that Chipotle allegedly failed to comply with. Finally, Chipotle did not make a material misrepresentation about the implementation of its new food safety protocol because Chipotle had actually instituted new food safety protocols when it filed the 2015 10-K and the 2016 10-K as alleged by several of the confidential witnesses.

For example, CW5 noted that after the 2015 crisis, "Chipotle implemented a number of improved protocols . . . ." (*Id.* at ¶ 64). CW7, CW8, and CW9 all confirmed that Chipotle implemented between sixty and seventy new procedures in 2016. (*Id.* at ¶ 66-67). CW2, CW4, CW5, CW7, CW8, and CW9 also confirmed that "after the Company announced the new food safety protocols, Area Managers were required to visit each of their restaurants once a week to conduct a food safety audit." (*Id.* at ¶ 103). These audits required the Area Managers to "check temperatures of grilled and ungrilled products, make sure employees are properly handling and storing food, keeping dishes clean, washing their hands frequently, and examine the 'little black book' [the book where food temperatures were recorded] to see if it was filled out correctly." (*Id.*). The SSR Department conducted additional food safety audits of every restaurant every quarter (*id.*), and a third party performed a third level of auditing (*id.* at ¶ 144).

Plaintiffs argue that Defendants' statements about implementing the new food safety protocols were nonetheless misleading because the internal audits showed that a number of Chipotle restaurants were failing the food safety audits and Chipotle had reduced staffing and training, which was preventing the successful implementation of the

new protocols. (ECF No. 44 at 15). I disagree because I find *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199 (S.D.N.Y. 2018) to be persuasive on this topic.

In *Ong*, a putative class of plaintiffs sued Chipotle for allegedly "fail[ing] to disclose certain granular details and attendant risks of its produce-processing and food-safety procedures." 294 F. Supp. 3d at 207. One of the challenged statements involved a 2014 Form 10-K ("2014 10-K"), which stated in part: "Our quality assurance department establishes and monitors our quality and food safety programs for our supply chain. Our training and risk management departments develop and implement operating standards for food quality, preparation, cleanliness and safety in the restaurants." *Id.* at 219. The plaintiffs claimed this statement was "materially false and misleading" because Chipotle "failed to disclose that Chipotle's quality assurance department did not adequately monitor Chipotle's food safety programs, that in 2015 Chipotle failed to live up to its own safety standards," that Chipotle executives ignored internal audit reports, and the internal audits were inherently deficient. *Id.* The court in *Ong* held these statements in the 2014 10-K were not "demonstrably false" because the complaint did "not allege that Chipotle failed to undertake such endeavors, but merely that Chipotle failed to do so 'adequately,' or that Chipotle 'failed to live up to its own food safety standards,' or that Chipotle's food-safety auditing system was 'inherently deficient.'" *Id.* at 232. In summary, the "allegations do not conflict with Defendants' statements regarding the food-safety programs and procedures that Chipotle had in place, but merely quibble with Chipotle's execution of those programs and procedures." *Id.*

The same is true here. Plaintiffs do not allege that the new food safety protocols were not implemented at all; instead, they allege only that the protocols were not

effectively implemented as indicated in some of the audits. Indeed, it is undisputed that many of Chipotle's new food safety protocols were successfully implemented because the audits only reviewed the portion of the new food safety protocols that involved the food preparation and service at the restaurants. (*See* Complaint, ¶ 103). But the new food safety protocols involved more than the restaurants. The 2015 10-K noted the new protocols included "DNA-based testing of many ingredients designed to ensure the quality and safety of ingredients before they are shipped to our restaurants." (*Id.* at ¶ 156). And the 2016 10-K described the new protocols as including "supplier interventions (steps to avoid food safety risks before ingredients reach Chipotle); . . . farmer support and training; . . . internal and third party restaurant inspections; and ingredient traceability." (ECF No. 40-3 at 6). Plaintiffs do not allege that any of these new safety protocols were not implemented, and at least with respect to the internal and third party inspections, Plaintiffs affirmatively allege this new protocol had been implemented. (*See, e.g.*, Complaint, ¶ 103). Thus, even assuming a percentage of Chipotle's restaurants were failing the in-store Weekly Food Safety Audits, and further assuming those failures were an indication of a total lack of implementation, other aspects of the new food safety protocols had indisputably been implemented.

I also find that Plaintiffs have not adequately pled loss causation under either a corrective disclosure theory or a materialization of a conceal risk theory. To support loss causation, Plaintiffs relied on media reports on July 18 and July 20, 2017 about the suspected norovirus outbreak in a restaurant in Sterling Virginia, and an analyst's opinion on Chipotle's 2017 third quarter earnings. (Complaint, ¶¶ 172-76, 182). Plaintiffs claim these reports and the third quarter earnings caused Chipotle's share price to drop on July

20 and October 25, 2017. Specifically, Plaintiffs argue the July 18 and July 20, 2017 disclosures "were partial corrective disclosures because they revealed Chipotle's failure to successfully implement the new food safety practices (*i.e.* employees were not following the new food safety practices)" and were "'materializations of the risk' created by Chipotle's failure to effectively implement the new practices, [and] devote the adequate resources to staffing and training." (ECF No. 44 at 38).

The problem for Plaintiffs is that the media articles do not report the cause of the outbreak in Sterling. Ells attributed the outbreak to the Sterling restaurant's failure to comply with Chipotle's procedures to prevent norovirus, and possibly to an employee who worked while sick. (Complaint, ¶ 178). But an outbreak due to a single restaurant's failure to comply with the new food safety protocols is different from an outbreak due to Chipotle's failure to implement the new food safety protocols in the first place. Certainly, there is nothing to indicate that the outbreak was caused by Chipotle's failure to properly train its employees or compliance with applicable safety regulations or industry standards.

Accordingly, Plaintiffs' Rule 10b-5 claims based on the 2015 10-K and the 2016 10-K are dismissed.

### B. April 2016 Press Release

The April 2016 press release announced

> What is most important is that ***we continue to build teams of top performers in our restaurants, and among our field leadership, which will allow us to continue to improve on our already high standards and exceptional customer experience***. We have some of the best employees in the industry, which continues to serve as a competitive advantage, and ***we will continue to invest in our people culture*** to help expedite the next stage of growth for Chipotle.

(Complaint, ¶ 158 (emphasis added in the Complaint)). Plaintiffs claim this statement was materially false and/or misleading because Chipotle was not building teams of top performers in its restaurants on food safety and was not investing in its staff, training, or culture. (*Id.* at ¶ 159).

I find that this statement is immaterial as a matter of law because it would not have misled a reasonable investor. In *Level 3*, the Tenth Circuit held that assertions that a company was "really focused on integration," and expressions of confidence in future progress like "[w]e are equally focused on insuring that the excellent reputation that [defendant] has earned over the years for customer service does not get degraded" and "[w]e remain confident in our end-state architecture and will make meaningful progress," were "vague (if not meaningless) management-speak upon which no reasonable investor would base a trading decision." 667 F.3d at 1340. I find the statements in the April 2016 press release to be analogous to the statements rejected as immaterial in *Level 3*. *See also Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1217 (1st Cir.1996) ( "[C]ourts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague . . . that no reasonable investor could find them important in the total mix of information available."); *In re Mellanox Techs., Ltd. Sec. Litig.*, 2014 WL 7204864, at *3 (N.D. Cal. Dec. 17, 2014) (noting statements that company would "continue to soar" and "continue to grow" were puffery); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 938 (D.N.J. 1998) (defendant statement that it "will continue to provide best in customer service" is puffery).

Accordingly, Plaintiffs' Rule 10b-5 claim based on the April 2016 press release is dismissed.

### C. October 2016 Press Release

The October 2016 press release quoted Moran as having said

> ***After successfully implementing an industry leading food safety program***, and as our marketing efforts are driving more people to our restaurants, it is critical that we are prepared to delight customers on every visit. ***We are confident that we have the leadership and teams in place to do just that***.

(Complaint, ¶ 160 (emphasis added in the Complaint)). Plaintiffs claim this statement was materially false and/or misleading because Chipotle had not successfully implemented its new food safety program and did not have the staff in place at its restaurants to execute its food safety protocols. (*Id.* at ¶ 161).

For the same reasons I found that Plaintiffs did not state a claim under Rule 10b-5 for the 2015 10-K and the 2016 10-K, I find that Plaintiffs have also not stated a claim based on the October 2016 press release to the extent it discussed Chipotle had "successfully implement[ed] an industry leading food safety program." To the extent the press release discussed Chipotle's confidence in having the right leadership and teams in place, I find that statement to be inactionable puffery. *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) (noting expressions of confidence about future performance were puffery); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036-37 (N.D. Cal. 2012) (same). Accordingly, Plaintiffs' Rule 10b-5 claim based on the October 2016 press release is dismissed.

### D. October 2016 Earnings Call

On the October 2016 earnings call Crumpacker stated

> During the quarter, we ran three marketing campaigns each with different but complementary objectives. The first was a food safety advancements campaign Monty referred to, which was designed to communicate what we've done to ensure the safety of our food. The campaign was broad reaching, with more than 90 million impressions. Lapsed customers engaged more than any others with the video component of the campaign. Results of the campaign are positive and ***we will continue to communicate the benefits of our food safety program so that every customer can rest assured that our food is as safe as possible***.

(Complaint, ¶ 162 (emphasis added in the Complaint)). Plaintiffs claim this statement was materially false or misleading because Chipotle's food was not "as safe as possible." (*Id.* at ¶ 163).

I find this statement is immaterial as a matter of law because it expresses "vague statements of corporate optimism" and amounts to "puffery." *Grossman*, 120 F.3d at 1119; *see also Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 967 n.2 (N.D. Cal. 2014) (finding statements related to confidence about "resolv[ing] this current report as quickly as possible" to be non-actionable opinion or mere puffery); *Last Atlantis Capital LLC v. AGS Specialist Partners*, 749 F. Supp. 2d 828, 840 (N.D. Ill. 2010) (finding statement that "traders kept the options markets as 'liquid, fair, and competitive as possible'" to be puffery). The statement is too general to cause a reasonable investor to rely on it when making an investment decision. *See Grossman*, 120 F.3d at 1119. Accordingly, Plaintiffs' Rule 10b-5 claim based on the October 2016 earnings call is dismissed.

### E. February 2017 Earnings Call

On the February 2017 earnings call, Ells said "I'm confident in the significant changes we've made throughout the last year to position Chipotle for a strong performance in 2017. These efforts include ***the implementation of an industry-leading food safety system***." (Complaint, ¶ 164 (emphasis added in the Complaint)). Plaintiffs

claim this statement was false and/or misleading because Defendants had not yet successfully implemented the new food safety system. (*Id.* at ¶ 165). For the same reasons I found Plaintiffs did not state Rule 10b-5 claims for the 2015 10-K and the 2016 10-K, I find that Plaintiffs have also not stated a claim based on the February 2017 earnings call to the extent it discussed Chipotle's "implementation of an industry-leading food safety system." Accordingly, Plaintiffs' Rule 10b-5 claim based on the February 2017 earnings call is dismissed.

### F. 2017 Schedule 14A

Chipotle stated in the 2017 Schedule 14A proxy statement that it had "[c]onducted a top-to-bottom review of our food safety programs and procedures and made enhancements to ensure that our food is as safe as it can possibly be." (Complaint, ¶ 169). The Complaint alleges this statement is misleading because Defendants had not "successfully implemented its food safety protocols" and Chipotle's food was not "as safe as it can possibly be." (*Id.* at ¶ 170). For the same reasons I found Plaintiffs did not state Rule 10b-5 claims for the 2015 10-K and the 2016 10-K, I find that Plaintiffs have also not stated a claim based on the 2017 Schedule 14A to the extent it discussed Chipotle's "enhancements." Accordingly, Plaintiffs' Rule 10b-5 claim based on the February 2017 earnings call is dismissed.

## VII. ANALYSIS OF CLAIMS FOR ALLEGED OMISSIONS IN VIOLATION OF RULE 10b-5, ITEM 303, AND ITEM 503

Plaintiffs allege the 2015 10-K, the April 2016 press release, the October 2016 press release, the October 2016 earnings call, the February 2017 earnings call, the 2016 Form 10-K, and the 2017 Schedule 14A failed to make certain disclosures. Plaintiffs allege each document or call omitted (1) Chipotle's restaurants were chronically and

severely understaffed; (2) employees did not have sufficient training hours; (3) Chipotle restaurants "were widely failing" food safety audits; (4) Chipotle failed to take sufficient remediation steps to prevent further outbreaks; (5) Chipotle had a poor food safety culture; (6) employees had a practice of "pencil whipping" food temperatures; and (7) employees failing certifications. (Complaint, ¶¶ 157, 159, 161, 163, 165, 168, 170). For statements made on or after October 25, 2016, Plaintiffs also allege Defendants omitted (8) foodborne illness outbreaks in several states and that (9) "if and when these outbreaks and/or additional outbreaks became publicized, they were reasonabl[y] expected to have an increased damaging effect on the Company's operations and financial performance." (*Id.* at ¶¶ 161, 163, 165, 168, 170).

Plaintiffs also allege the 2015 10-K, the 2016 10-K, three quarterly filings submitted in 2016, and two quarterly filings submitted in 2017 made material omissions in violation of Item 303 and Item 503. Plaintiffs allege each document omitted (1) Chipotle's restaurants were chronically and severely understaffed; (2) employees did not have sufficient training hours; (3) Chipotle restaurants "were widely failing" food safety audits; (4) Chipotle failed to take sufficient remediation steps to prevent further outbreaks; (5) foodborne illness outbreaks in several states; and (6) "if and when these outbreaks and/or additional outbreaks became publicized, they were reasonabl[y] expected to have an increased damaging effect on the Company's operations and financial performance." (*Id.* at ¶¶ 189, 192).

**1. Understaffing**

Plaintiffs have not pled loss causation related to Chipotle's understaffing. Plaintiffs argue they have pled loss causation under a materialization of the risk theory "by

Chipotle's failure to . . . devote the adequate resources to staffing . . . which would have informed investors of the level of the ongoing risk."[2] (ECF No. 44 at 38). A plaintiff must show "that the defendant's misrepresentation concealed *a risk that caused a loss for the plaintiff when the risk materialized*" to support loss causation based on a theory of materialization of a risk. *Nakkhumpun*, 782 F.3d at 1154 (emphasis added). But, the news articles reporting on the Sterling outbreak do not indicate the cause of the outbreak, and no allegations in the Complaint link the outbreak to understaffing. (*See* ECF No. 40-5). The Complaint does not even allege the Sterling restaurant was understaffed, and none of the confidential witnesses worked in a region that included Virginia. (Complaint, ¶¶ 33-41). Without these allegations, it is speculative, at best, to conclude that Sterling's understaffing caused the restaurant to not implement the new food safety protocols. Consequently, it is also speculative to conclude that understaffing caused Chipotle's share price to drop when Chipotle revealed the Sterling restaurant had not followed the procedures. Accordingly, Plaintiffs' Rule 10b-5 claims based on this alleged omission are dismissed.

**2. Training**

Plaintiffs have not pled a strong inference of scienter regarding Chipotle eliminating food safety training hours. To meet the scienter element in a suit alleging the omission of a material fact, a plaintiff must show "(1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." *In re Zagg, Inc. Sec. Litig.*, 797 F.3d at 1200-01 (internal

---

[2] Plaintiffs only argue that loss causation is available under both a corrective disclosure theory and a materialization of the risk theory for their allegation that Chipotle failed to implement the new food safety protocols. (ECF No. 44 at 38).

quotation marks omitted). The Complaint does not allege that Defendants knew that training hours were being eliminated or that the elimination of those hours prevented the implementation of the new food safety protocols. Instead the Complaint makes general references to complaints to "management," to the unavailability of extra training hours, and to a software program that set labor hours. (Complaint, ¶¶ 58, 81, 84, 87-88, 90-91, 94). None of these allegations are sufficient to establish Defendants knew about the allegedly inadequate training hours.

Because Plaintiffs have not alleged a strong inference of scienter, Items 303 and 503 do not support a claim for a violation of Rule 10b-5 because Item 303 and Item 503 require a plaintiff to "allege that the registrant knew at the time of an offering that a risk or uncertainty existed." *Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 255 (D. Mass. 2018) (citing *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013)). Accordingly, Plaintiffs' Rule 10b-5 claims based on this alleged omission are dismissed.

**3. Food Safety Audits and Remediation Steps**

Plaintiffs have not pled a strong inference of scienter regarding Defendants' failure to disclose the results of the Weekly Food Safety Audits or Chipotle's allegedly insufficient remediation steps. Plaintiffs have not shown that Defendants knew that the failure to reveal the results of the food safety audits or the remediation steps "would likely mislead investors." *In re Zagg, Inc. Sec. Litig.*, 797 F.3d at 1201 (internal quotation marks omitted). Defendants disclosed in the 2015 10-K and the 2016 10-K that even with enhancing its food safety procedures, Chipotle "may still be at a higher risk for food-borne illness occurrences than some competitors due to our greater use of fresh, unprocessed produce and meats, our reliance on employees cooking with traditional methods rather

than automation, and our avoiding frozen ingredients." (ECF No. 40-2 at 12; ECF No. 40-3 at 11). After alerting investors that there was a "higher risk for food-borne illness" at Chipotle than at comparable restaurants, "a reasonable corporate officer in similar circumstances would be unlikely to recognize any risk posed by the nondisclosure of specific test results." *In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp. 3d 846, 869 (W.D. Ky. 2014). For these same reasons, these disclosures were sufficient to satisfy Chipotle's disclosure obligations under Item 303 and Item 503. *See Ong*, 294 F. Supp.3d at 235 (noting Chipotle's "provided disclosures regarding its risks that were company-specific and related to the direct risks it uniquely faced" (internal quotation marks omitted)). Accordingly, Plaintiffs' Rule 10b-5 claims based on these alleged omissions are dismissed.

**4. Food Safety Culture, Pencil Whipping, and Certifications**

Plaintiffs have not pled a strong inference of scienter regarding Chipotle's poor food safety culture, pencil whipping, or employees failing certifications.

Plaintiff's allegations of a poor food safety culture are based solely on the opinions of CW5, an Area Manager. (Complaint, ¶¶ 108-110). CW5's opinions do not give rise to an inference of scienter. Nothing in the Complaint indicates that Defendants knew about the pencil whipping practice. Although the Complaint alleges the practice of pencil whipping was "widely known at Chipotle," and the books containing food temperatures were "mailed to Chipotle corporate," (*Id.* at ¶¶ 98, 102), these general allegations do not establish that Defendants themselves knew about the practice or could have identified evidence of pencil whipping merely by looking at the books recording food temperatures. *See Caprin v. Simon Trans. Servs., Inc.*, 99 Fed. App'x 150, 159 (10th Cir. 2004) (holding

plaintiffs failed to plead scienter when they did not plead who was responsible for data, how the data was used, or when the individual defendants had knowledge of the data). Finally, Plaintiffs have not identified a single employee who failed a certification.

Because Plaintiffs have not alleged a strong inference of scienter, Items 303 and 503 do not support a claim for a violation of Rule 10b-5 because Item 303 and Item 503 require a plaintiff to "allege that the registrant knew at the time of an offering that a risk or uncertainty existed." *Dahhan*, 321 F. Supp. 3d at 255. Accordingly, Plaintiffs' Rule 10b-5 claims based on these alleged omissions are dismissed.

**5. Foodborne Illness Outbreaks**

Plaintiffs have not pled a securities violation regarding the alleged omission of other foodborne illness outbreaks. Chipotle disclosed in its 2016 10-K that it had "seen instances of unsubstantiated reports linking illnesses to Chipotle, and these reports have negatively impacted us." (ECF No. 40-3 at 11). Plaintiffs take issue with the phrase "unsubstantiated reports," (ECF No. 44 at 22), but I find Plaintiffs' dispute with this phrase is without merit for two reasons.

First, Chipotle also disclosed in its 2016 10-K that "[e]ven if food-borne illnesses are attributed to us erroneously or arise from conditions outside of our control, the negative impact from any such illnesses is likely to be significant." (ECF No. 40-3 at 11). Therefore, regardless of whether the reports of foodborne illnesses were substantiated or unsubstantiated, Chipotle disclosed the "significant" negative impact any such reports would have. Not disclosing specific instances of outbreaks was not a material omission because disclosing the specific outbreaks would not have "significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc.,* 563 U.S. at 38 (quoting *Basic*

*Inc.,* 485 U.S. at 231–32). Chipotle had already communicated that any real or imagined outbreaks would have negative consequences.

Second, Plaintiffs have failed to allege when any of the five foodborne illness outbreaks became substantiated or when Defendants would have known about the five foodborne illness outbreaks for purposes of establishing scienter. The alleged outbreaks suffer from the same general defect: there are no allegations connecting the results of any investigation of the alleged outbreaks to any of the individual Defendants, and the Chipotle employees and consultants who may have learned about the outbreaks were not "senior controlling officers" whose knowledge could be imputed to Chipotle. *See Adams*, 340 F.3d at 1106-07 (noting that only "scienter of the senior controlling officers of a corporation may be attributed to the corporation itself").

The Maryland outbreak is based on a rumor that CW8 heard from a Team Director and occurred sometime in 2016. (Complaint, ¶ 115). The first Michigan outbreak happened in mid-2016, and a local public health department investigated the incident and wrote a report. (*Id.* at ¶¶ 116-20). Rosyln Stone, who was a consultant retained by Chipotle, communicated with the public health department and wrote a white paper. (*Id.* at ¶¶ 31, 119). Stone was also involved in the second Minnesota outbreak, which occurred in February 2017. (*Id.* at ¶ 126-31). She received foodborne illness hotline complaints, communicated with the local health department, and received the final report. (*Id.* at ¶¶ 127, 131). But there are no allegations that she reported the results of either investigation to any of the individual Defendants. Although Stone involved two other Chipotle employees in the Michigan outbreak, and an employee from Chipotle's SSR department in the Minnesota outbreak, Plaintiffs do not allege these employees were

"senior controlling officers," *Adams*, 340 F.3d at 1106, or that these employees communicated the results of any investigation with any of the individual Defendants.

The first Minnesota outbreak and the Florida outbreak occurred in December 2016 and January 2017, respectively. (*Id.* at ¶¶ 121, 125). In both cases, the local health departments informed someone at Chipotle about the incidents, inspected the individual restaurants, and issued a report. (*Id.* at ¶¶ 121, 124-25). But, once again, Plaintiffs do not sufficiently allege whether the individual Defendants were aware of these outbreaks or the conclusions of the investigations.

Because Plaintiffs have not alleged a strong inference of scienter, Items 303 and 503 do not support a claim for a violation of Rule 10b-5. *See Dahhan*, 321 F. Supp. 3d at 255. Accordingly, Plaintiffs' Rule 10b-5 claims based on these alleged omissions are dismissed.

**6. Potential Impact of Future Outbreaks**

Finally, Plaintiffs have not pled a securities violation regarding the alleged omission that "if and when these outbreaks and additional outbreaks became publicized, they were reasonabl[y] expected to have an increased damaging effect on the Company's operations and financial performance." (*See, e.g.*, Complaint, ¶ 168). Chipotle's 2016 10-K disclosed that unsubstantiated reports linking illnesses to Chipotle "have negatively impacted us." (ECF No. 40-3 at 11). The 2016 10-K further warned "[e]ven if food-borne illnesses are attributed to us erroneously or arise from conditions outside of our control, the negative impact from any such illnesses is likely to be significant." (*Id.*). These disclosures also satisfied the requirements of Item 303 and Item 503. Accordingly, Plaintiffs' Rule 10b-5 claims based on these alleged omissions are dismissed.

## VIII. <u>ANALYSIS OF CLAIM UNDER SECTION 20(a)</u>

Defendants argue Plaintiffs did not state a claim under Section 20(a) because Plaintiffs did not plead a primary securities violation. (ECF No. 40 at 31; ECF No. 50 at 15 n.6). Because I agree Plaintiffs have not pled a primary securities violation of Rule 10b-5, Plaintiffs' Section 20(a) claims are dismissed.

## IX. <u>PLAINTIFFS' MOTION FOR LEAVE TO AMEND</u>

As an alternative to denying Defendants' motion to dismiss, Plaintiffs request permission to file a second amended complaint. (ECF No. 44 at 17 n.1, 21 n.2, 39 n.14). It is normally improper to request leave to amend a complaint in response to a motion to dismiss. *Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1187 (10th Cir. 1999) ("[W]e hold that [the plaintiff's] single sentence, lacking a statement for the grounds for amendment and dangling at the end of her memorandum, did not rise to the level of a motion for leave to amend."); D.C.COLO.LCivR 7.1(d) ("A motion shall not be included in a response or reply to the original motion."). Nonetheless, a district court retains "wide discretion to recognize a motion for leave to amend in the interest of a just, fair or early resolution of litigation." *Calderon*, 181 F.3d at 1187. I find that it is in the interest of "a just, fair or early resolution" of this litigation to address Plaintiffs' motion for leave because any amendment would be futile.

Federal Rule of Civil Procedure 15(a)(2) provides that a party may amend its pleading "only with the opposing party's written consent or the court's leave" and such leave shall be freely given "when justice so requires." Refusing leave to amend may be justified when any amendment would be futile. *See, e.g.*, *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993). A proposed amendment "is futile if the complaint, as

amended, would be subject to dismissal." *Jefferson Cnty. Sch. Dist. v. Moody's Investor's Servs.*, 175 F.3d 848, 859 (10th Cir. 1999).

Plaintiffs raise two arguments in support of their motion for leave to file a second amended complaint. First, Plaintiffs claim that when they filed the Complaint, "Plaintiff's Public Records Request to the Maryland Department of Health ("MHD") was still outstanding. Plaintiffs have since received documents from MDH documenting an outbreak." (ECF No. 44 at 17 n.1). This argument is futile. I found the non-disclosure of specific outbreaks was not a material omission because Chipotle had already communicated the consequences of any outbreaks, regardless of whether those outbreaks were confirmed or refuted. Thus, regardless of the results of the MHD's investigation, Chipotle had already sufficiently disclosed the risk of additional outbreaks in its 2016 10-K.

Second, Plaintiffs request leave to add statements Ells made during an earnings call on February 2, 2016. (ECF No. 44 at 21 n.2; *see* ECF No. 45-1 at 3 (content of earnings call)). This argument is also futile. Ells' statements cannot serve as a basis for Plaintiffs' claims because they were made before the Class Period. In any event, Ells' statements concern the implementation of Chipotle's new food safety protocols and the quality of Chipotle's employees. (ECF No. 45-1 at 3-4). I previously found these statements were either not material misrepresentations or puffery, and Ells' proposed statements fall into those same categories and are therefore not actionable.

Accordingly, Plaintiffs' request for leave to file a second amended complaint is denied.

## X. <u>CONCLUSION</u>

Based on the foregoing, Defendants' Motion to Dismiss the Amended Complaint Pursuant to Fed.R.Civ.P 9(b) and 12(b)(6) (ECF No. 40) is **GRANTED** and Plaintiffs' claims are **DISMISSED WITH PREJUDICE.** It is

FURTHER ORDERED that Plaintiffs' request for leave to file a second amended complaint is **DENIED**. It is

FURTHER ORDERED that the Clerk of the Court is directed to close this case.

Dated: March 29, 2019.

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge